**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**FOUR WINDS INDUSTRIES, INC., Respondent.**

**No. 74–3251.**

United States Court of Appeals, Ninth Circuit.

Feb. 4, 1976.

Rehearing Denied April 26, 1976.

---

Alan D. Cirker, Atty. (argued), NLRB, Washington, D. C., for petitioner.

A. Patrick Nagel (argued), of Nagel, Regan & Davidson, Santa Ana, Cal., for respondent.

## OPINION

Before DUNIWAY and KENNEDY, Circuit Judges, and BURNS,* District Judge.

BURNS, District Judge:

The National Labor Relations Board seeks enforcement, pursuant to Section 10(e) of the National Labor Relations Act, 29 U.S.C. § 160(e), of an order of June 13, 1974, against Four Winds Industries, Inc. (Four Winds). The Board's decision and order are reported at 211 N.L.R.B. No. 60.

---

* Honorable James M. Burns, United States District Judge, District of Oregon, sitting by designation.

1. The charges as summarized by the Administrative Law Judge were: (1) unlawful refusal to recognize and bargain with the Union; (2) violation of Section 8(a)(3) and (1) by discharging employees Joe Rodarte and Jay Cormier for their union activities; (3) threatening

## I. *PROCEEDING BELOW:*

Four Winds was charged with five unfair labor practices.[1]  The Administrative Law Judge found in favor of Four Winds on all charges.  The Board reversed the Administrative Law Judge in part and found that Four Winds had: (1) violated Section 8(a)(1) of the Act, 29 U.S.C. § 158(a)(1), by statements which evidenced a refusal to bargain about a union-security clause and which threatened permanent replacement of strikers; (2) violated Section 8(a)(3), 29 U.S.C. § 158(a)(3), and 8(a)(1) of the Act by discharging employees Joe Rodarte and Jay Cormier because of their union activities; (3) violated Section 8(a)(5), 29 U.S.C. § 158(a)(5), of the Act as well as Section 8(a)(1) by its refusal to bargain about a union-security clause.  The Board ordered Four Winds to reinstate the employees with back pay and to bargain with the Union.

## II. *SUMMARY OF FACTS:*

Four Winds manufactures and sells campers and mobile homes at its plant in Santa Ana, California.  At times material herein, it employed from 40 to 47 employees.  Rodarte contacted William Miller, Union Representative of the Orange County District Council of Carpenters, and received authorization cards which Rodarte, Cormier, and other employees distributed during breaks at Four Winds. Miller received by mail and hand-delivery at least 24 cards.[2]  Between October 24, 1972, and October 26, 1972, Miller contacted Lee Walters, President of Four Winds, in person and by mail and requested recognition of the Union as the employees' bargaining agent.  On October 27, 1972, Miller met with Four Winds' counsel who informed Miller that Four Winds would not recognize the Un-

---

employees with plant closure if they supported the Union; (4) engaging in surveillance of its employees' union activities; (5) distributing literature threatening a refusal to bargain with the Union in good faith and threatening loss of employment to employees continuing to support the Union.

2. Although 32 cards were allegedly signed, only 24 were in evidence.

ion. He suggested that Miller should pursue Board processes.

On November 13, 1972, the Union filed a petition for certification as a bargaining representative. On November 17, 1972, Rodarte and Cormier were discharged. On October 30, 1972, January 3, 1973, and January 9, 1973, Four Winds distributed anti-union literature. On January 12, 1973, the election was held. The Union lost 26 to 3 with 4 votes challenged.

III. *STATEMENTS IN PRE–ELECTION LITERATURE:*

Section 8(a)(1) provides that:

"(a) It shall be an unfair labor practice for an employer—(1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 [organization and collective bargaining] of this title;"

This is modified, however, by the so-called "free speech" clause of Section 8(c), 29 U.S.C. § 158(c) which states:

"The expressing of any views, argument, or opinion, or the dissemination thereof, whether in written, printed, graphic, or visual form, shall not constitute or be evidence of an unfair labor practice under any of the provisions of this subchapter, if such expression contains no threat of reprisal or force or promise of benefit."

■ This section protects the right of both employers and employees. Because of the importance freedom of speech has under our Constitution alleged unfair labor practices in the form of speech must be carefully scrutinized. Unless the speech contains a "threat of reprisal or force or promise of benefit" it is privileged. A mere prediction of what effect unionization would have is not an unfair labor practice. *N.L.R.B. v. Gissel Packing Co.*, 395 U.S. 575, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969). In making a prediction the employer must be careful to base his statements on an eventuality that is capable of proof, and not on an implication that his own initiative will cause economic detriment. *Gissell, supra* at 618, 89 S.Ct. 1918. The interpretation of the speech in issue must take place in a setting which balances the rights of both parties but recognizes the economically dependent relationship of the employee to the employer. *Gissell, supra* at 617, 89 S.Ct. 1918. The choice of proper words is not an exercise in "brinkmanship." *Gissell, supra* at 620, 89 S.Ct. 1918. We look not for certain words that are allowed and others that are forbidden. Rather, we are to view the statements in their entirety and consider their total effect on the receiver. *Gissell, supra* at 619, 89 S.Ct. 1918; *N.L.R.B. v. Tommy's Spanish Foods, Inc.*, 463 F.2d 116 (9th Cir. 1972).

■ Substantial portions of the pre-election literature at issue here, General Counsel Exhibits 6(a), (b), and (c), are set out in an appendix to this opinion. We conclude that the literature as a whole conveys an *inevitability* that a union shop and other unrealistic demands will result from unionization; that these demands will be unacceptable to Four Winds; that the vote of the employees will have caused this; and that a strike with job loss, i. e., permanent replacement, of striking employees the only possible outcome. This is less than a prediction of the effect of unionization capable of proof. Rather it is a thinly veiled threat from the employer that voting in the Union would inevitably result in ultimate job loss for its supporters. We hold this to be a violation of Section 8(a)(1) of the Act. The use of the phrase "bargaining in good faith" does not dissipate the coercive tone of the entirety. We do not attach the special distinctions to the words "moral right" that underlay the Administrative Law Judge's decision. Nor do we consider this language different in tone from that used in *Tommy's Spanish Foods, supra*.[3]

---

**3.** In *N.L.R.B. v. Tommy's Spanish Foods, Inc.*, 463 F.2d 116 (9th Cir. 1972), the employer met with the employees to inform them "[we] would never agree to any union demand to which 'we were opposed as a matter of principle.'" In letters delivered to employees the

Four Winds argues that its language in the present case is similar to that in *Adco Advertising, Inc.*, 206 N.L.R.B. No. 58 (1973) and *O'Neil Moving & Storage, Inc.*, 209 N.L.R.B. No. 82 (1974) which was upheld by the Board.[4] Four Winds argues that it is entitled to consistency from the Board. Those cases, however, are not before us. Four Winds, the Board, and the Union all are entitled to consistency from this court. *Tommy's Spanish Foods* controls because the effect of the language in it and this case was to convey to the workers that unionization would unalterably result in a stand-off between the employer and the union. In the inevitable loyalty contest which would follow, union supporters would lose their jobs. To an employee in a position of economic dependence the message is received as a threat of reprisal. Since there is substantial evidence to support the Board's conclusion upon this ground, the order calling for cessation of this type of violation should be and is enforced.

## IV.   DISCHARGE OF RODARTE AND CORMIER:

■  We do not, however, affirm the Board's order with respect to the discharge of employees Rodarte and Cormi-

---

employer informed them she would "flatly reject" any union demands she believed were not in the best interests of both. Language in an additional letter was:

"So there will be absolutely no misunderstanding, we are strongly opposed to the union organization of our employees. . . .
If you vote this union in you know that the only alternative available to the Union, if we refuse to meet its demands, is to pull you out on strike. If that happens, we won't close our doors even for one day and will run it with those of you who want to stay and we will permanently replace those who go on strike. The law permits us to do that and we will. . . ."

4. Pertinent passages from *Adco Advertising, Inc.*, 206 N.L.R.B. No. 58 (1973) are as follows:

"We want you to *know* exactly how we feel about the effort of the Graphic Arts International Union to organize you. *Let there be no doubt about it—we firmly believe that you don't need any union to represent you and that our treatment of our employees over the past years is the best proof of that. What is more, we are convinced that a union representing our production and maintenance employees would permanently destroy our good relationship with you.*

"The Graphic Arts Union invariably insists on a union shop which requires that all employees must be members of the union. If we were to agree to a union shop we would have to fire anyone who refused to become a member of the union and pay dues or initiation fees. Would you want us to force any of our employees, present and future, to join this union against their wishes in order to earn a living? We think not. We believe that we do not have the moral right to force our people to join a union in order to work here.

" . . . *no union can force us to sign any contract that is not acceptable to us* after we have bargained in good faith and have failed to reach agreement, should you vote the union in.

"*At that point the only way the union can enforce its demands is by asking you to go out on a strike. Remember that there can be no strikes if there is no union; there can be no loss of income because of strikes, or loss of income because of payment of dues if there is no union.*

"*On the other hand, if you go out on a strike for higher wages and benefits, you will get absolutely no benefits from the union while you are on strike. What is more, if there is a strike we would not close down our operation for even one day. We would expect that most of our employees would continue working but in any event we would hire employees permanently to replace our present employees who strike. This is our right under the law. We tell you this not as any threat, but to make sure you are well informed before you bring this union in and it is too late.*"

Pertinent passages from *O'Neil Moving & Storage, Inc.*, 209 N.L.R.B. No. 82 (1974) are as follows:

"Here's what you can expect from Teamsters' representation: The only contract that the Teamsters will agree to, if they win the election, is the industry-wide Southern California area contract, for the moving and storage industry. This includes the union shop, among many other objectionable provisions.

"A union shop would require each and every one of you, as well as any future employee, to be a member of the Teamsters. This would force us to fire anyone who refused to become a member and pay dues, assessments and fines which are totally controlled by the Teamsters. We are opposed to this and do not believe we have any right to force any of our people to join any union to keep their jobs."

er. The issue here is largely determined by the credibility of the witnesses. Great weight is given to the findings in this area of the Administrative Law Judge who heard the testimony and observed the demeanor of the witnesses. *Universal Camera Corp. v. N.L.R.B.*, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951); *N.L.R.B. v. Walton Mfg. Co.*, 369 U.S. 404, 82 S.Ct. 853, 7 L.Ed.2d 829 (1962). This is especially true when the findings of the Board are different from those of the Administrative Law Judge. *Universal Camera, supra.*

■ The Administrative Law Judge made explicit findings against the credibility of the employees. He found that Rodarte and Cormier deliberately misstated the facts. He gave no credit to their testimony. He was unfavorably impressed by the demeanor and testimony of Granneman, a co-employee who testified for Rodarte and Cormier. Although Rodarte and Cormier were granted wage increases during their employment, the Administrative Law Judge found specifically that their employment records (Respondent's Exhibits 3 and 4) showing tardiness, poor work, violations of rules, and repeated warnings were made "on the job" and were not created for purposes of the hearing. He considered the timing of the discharges but did not find it determinative. Discharges had been recommended earlier but were delayed because Four Winds' counsel had advised against terminating employees during a union campaign. The Administrative Law Judge explicitly credited the testimony of Walters, Four Winds' President, and McAfee, Four Winds' Shop Supervisor. He found that Rodarte and Cormier were discharged for the reasons shown in their employment records. There is additional evidence in the record concerning the adverse effect this poor work was having on the production and the other employees.

There is little evidence that Walters knew of the union activities of Rodarte and Cormier. Miller introduced Rodarte and Cormier, along with others, as the union organizing committee to the Plant Manager and Plant Supervisor. There is no substantial evidence the employees were introduced in this capacity to Walters nor that the Plant Manager's account to Walters of the introduction included anything more than the generalities of the episode. The most that can be said is that Walters walked up to Miller on company property one day when Miller was speaking to Rodarte, Cormier and others, and that Walters was aware the two employees were among the plant employees who ate lunch together because they favored the union. There is no substantial evidence that Walters had knowledge of any union activity on either employee's part beyond membership on the "in plant committee" and a favorable attitude toward the Union, both of which they shared with other employees. In the absence of substantial evidence of such knowledge, it will not be presumed. *N.L.R.B. v. Klaue*, 523 F.2d 410 (9th Cir. 1975). We hold there was substantial evidence to support the Administrative Law Judge's finding that Rodarte and Cormier were discharged because of their poor work performance. There is a lack of substantial evidence to support the Board's conclusion on this matter. As a result, we reverse the order of the Board requiring reinstatement and back pay of these two.

## V. *BARGAINING ORDER:*

■ Because of our finding that the pre-election statements violated Section 8(a)(1) of the Act, we affirm the Board's order setting aside the election. We question, however, the propriety of the bargaining order, especially in view of our finding that the discharges of Rodarte and Cormier were justified. The Board gave considerable weight to the effect of these discharges on the election in its decision to order Four Winds to bargain with the Union. A bargaining order is clearly proper where there are extraordinary violations, and may even be upheld where there are lesser practices which still "undermine majority strength and impede the election

processes." *Gissell, supra* 395 U.S. at 614, 89 S.Ct. at 1940. There are less extensive unfair labor practices which will not sustain a bargaining order. *Gissell, supra* at 615, 89 S.Ct. 1918. The commission of an unfair labor practice does not automatically result in an order to bargain. *Id.* In choosing a remedy *Gissell* has directed the Board to consider the extensiveness of the unfair labor practices, their effect on the election, the likelihood that they will reoccur, and whether a fair election could be held. In the present case the authorization cards entered into evidence amounted to a bare majority, although there was testimony that a greater number were signed. The language in the pre-election statements, though considered improper by this court, was not greatly dissimilar from *Adco Advertising* and *O'Neil Moving & Storage* which had been approved by the Board. The discharges of Rodarte and Cormier under our findings cannot be considered to have influenced the election. We are mindful that the Board's choice of a remedy is given special respect by reviewing courts but we remand this case to the Board in light of the above considerations to reconsider whether Four Winds should be required to bargain or a new election be held.

### APPENDIX

Certain portions of the letters which follow have been summarized, others have been quoted in detail. All emphasis was in the original.

*General Counsel Exhibit 6(a)* — a letter dated October 30, 1972, and addressed "TO: ALL PRODUCTION AND MAINTENANCE EMPLOYEES AT FOUR WINDS INDUSTRIES"

The first four paragraphs are a general introduction concerning the contacts the Union had made with Four Winds, Four Winds' unfavorable attitude toward the Union, the significance of authorization cards, and the possibility of an election supervised by the N.L.R.B.

Paragraph five, page one, continues:

"We want to make our position clear at this time so you will be fully informed regarding all the issues involved in any decision by you. The simple fact is that we are opposed to the Carpenters, or any union. Some of the reasons are as follows:

"1. The Carpenters Union, to our knowledge, never signs a contract without a union shop provision which requires that all employees be members of the union and pay their monthly dues in order to be able to work. This would force your company to fire anyone who refuses to become a member of the union and pay dues. *We are opposed to this and do not believe we have any moral right to force any of our people to join any union to keep their jobs.*

"Would our employees want us to force them into the union and pay dues against their wishes? We think not.

"2. We are convinced that the Carpenters will make other demands on us, such as higher wages and benefits, because they have made *promises* to you and they will feel compelled to deliver on those promises. We will review for you our record to show you that you are now getting the highest wages and benefits in our industry."

A recital of wages and benefits and a paragraph on Union promises in general complete page two. Page three begins:

"The Union will be telling you that once it wins representation rights, your company will have to sit down at the bargaining table and we will be forced to sign the contract the union will be insisting on. This is not true.

*"Bear in mind that while you have the right to decide for yourselves whether you want this union to represent you, we also have the absolute right, under the law, to decide for ourselves on what kind of a contract we will be willing to sign. We have the absolute right under the law to make the final decision of what is good for the company and no union can force us to sign any contract that is not acceptable to us.*

APPENDIX—Continued

"You are cautioned to look ahead and realize that if we cannot do business with the Carpenters, should you vote them into our operation, because their demands are unrealistic, as they inevitably will be, the only way the union can enforce its demands is by calling our employees out on a strike. This is the history of unions and this union is quite prepared to play with your futures since it costs the union no money.

"On the other hand, we want you to know that in the event the union prevails upon you to go out on a strike, you will get no benefits from the union. What is more, if there is a strike we are not going to close down our operation for even one day. We would expect that a good percentage of our employees would continue working and we would hire other employees permanently to replace the present employees who would refuse to cross any union picket line. This is our right under the law. We tell you this not as any threat, but to make sure you are well informed before you bring the union in and it's too late."

The last two paragraphs emphasize Four Winds' interest in its employees, recognize the right of both sides to a free choice, remind the employees that there can be no strikes or loss of income if there is no union and that the law permits their permanent replacement.

*General Counsel Exhibit 6(b)*—letter dated January 3, 1973, and addressed "TO: ALL PRODUCTION AND MAINTENANCE EMPLOYEES"

The two introductory paragraphs concern the election to be held on Friday, January 12, 1973, and its importance. Paragraph three continues:

"Here are several facts which should convince you to vote 'NO' on January 12th and reject the Carpenters by an overwhelming margin:

"1. Don't be misled by the Carpenters that Four Winds Industries has to sign whatever contract the union demands, once it wins the election.

Nothing could be further from the truth. *We have the absolute right under the law to decide what is good for Four Winds and no union can force us to sign any contract which is not acceptable to us.*

"2. In other words, if the union were to win the election, we at Four Winds Industries would be influenced primarily with what is good for the company and our employees and not what the union's demands were. Once we have negotiated in good faith and the union's demands are not acceptable to us, then the only thing the union can do is try to enforce its demands by striking. *As we told you before, if the union prevails upon you to go out on a strike, you will get absolutely no benefits from the Carpenters. What is more, if there is a strike, we're not going to close down our operation for even one single day. We would expect that a good percentage of our employees would continue working and we would hire other employees permanently to replace the present employees, who would refuse to cross any union picket line. This is our right under the law.* We tell you this not to threaten you, but to make sure you are well informed before you bring the union in and before it is too late."

The remaining five paragraphs review the good record Four Winds has with its employees, compare the "facts" of the benefits the company offers with the "promises" of the Union, and recite the unfair labor practice charges of the Union over the firing of Rodarte and Cormier as an example of Union meddling.

*General Counsel Exhibit 6(c)*—letter dated January 9, 1973, and addressed "TO: ALL PRODUCTION AND MAINTENANCE EMPLOYEES AT FOUR WINDS INDUSTRIES"

The first five headings provide details on the forthcoming election and urge every employee to vote. The sixth heading is:

APPENDIX—Continued

*"FIRST AND FOREMOST IS YOUR
JOB SECURITY:"*

The first four paragraphs under the above heading emphasize that it is Four Winds who provides the jobs, not the Union. The fourth paragraph ends:

"Here are the most important issues which should influence your vote on January 12th.

"1. We believe that the union, if it wins, must make good on its promises and insist on higher wages and benefits. *We have the absolute right, under the law, to refuse to grant any union demands if we believe they are not in our company's best interest.*

"2. *We are positive that the union will insist on a union shop if it wins. We believe that we do not have the moral right to force any of our employees into the union and force them to pay dues in order to work here.*

"3. *We believe that the expected union demands for higher wages and benefits makes a strike highly likely if we cannot reach agreement after bargaining in good faith.*

"4. If there is a strike because we cannot agree on contract terms after bargaining in good faith, we will not close our plant for even one single day, but we will stay open. Each one of you will be welcome to work if there is a strike—we will have jobs for you. *But remember this, the law gives us the right permanently to replace any striking employees and we have the absolute right under the law to make the final decision of what is good for the company. No union can force us to sign any contract which is not acceptable to us.*"

Point five reminds the employees of their wages and benefits. Its second paragraph continues:

"Remember this—if you feel Four Winds Industries has treated you fairly and squarely, then the only safe thing for you to do is to vote 'NO.' "

The third paragraph of point five speaks of the difficulty of getting rid of a union once it is voted in, including "years of bitter strikes."

The closing paragraph is:

*"Vote 'NO' on January 12th and reject the Carpenters by an overwhelming margin. Vote 'NO' to protect your job security. Vote 'NO' against paying dues for empty promises. Vote 'NO' against outsiders destroying our good relations."*