**PENASQUITOS VILLAGE, INC., Penasquitos Gardens, Inc., Penasquitos Hills, Inc., and San Diego Leisure Life Village, Petitioners,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

No. 75–2173.

United States Court of Appeals, Ninth Circuit.

Nov. 30, 1977.

J. Robert O'Connor, III (argued), of Don-
nelley & Holden, San Diego, Cal., for peti-
tioners.

John D. Burgoyne (argued), Washington,
D. C., for respondent.

Before DUNIWAY, CHOY and WAL-
LACE, Circuit Judges.

**1076**

WALLACE, Circuit Judge:

The National Labor Relations Board (the Board), reversing the decision of an administrative law judge, held that Penasquitos Village, Inc. and affiliated companies (Penasquitos) had engaged in coercive interrogation of employees in violation of section 8(a)(1) of the National Labor Relations Act (the Act), 29 U.S.C. § 158(a)(1), and had wrongfully discharged employees in violation of section 8(a)(3) of the Act, 29 U.S.C. § 158(a)(3). 217 NLRB 878 (1975). Penasquitos petitioned us to review and set aside the Board's order, alleging that it was not supported by substantial evidence. The Board cross-petitioned for enforcement. We refuse enforcement and set aside the order.

## I.

This case presents no contested or novel legal issues regarding the alleged unfair labor practices. The dispute is basically factual, and the central legal principle requiring clarification concerns the respective and related roles of the administrative law judge, the Board and the Court of Appeals in resolving factual disputes, particularly those turning on the credibility of witnesses. Because of this, it would be more appropriate to first analyze the law before proceeding to a detailed examination of the facts.

■ We treat as conclusive the factual determinations in a Board decision if they are "supported by substantial evidence on the record considered as a whole." § 10(e)–(f) of the Act, 29 U.S.C. § 160(e)–(f). This statutorily mandated deference to findings of fact runs in favor of the Board, not in favor of the initial trier-of-facts, the administrative law judge. Nevertheless, the administrative law judge's findings of fact constitute a part of that whole record which we must review. We give those initial

findings some weight, whether they support or contradict the Board's factual conclusions. *See Universal Camera Corp. v. NLRB*, 340 U.S. 474, 492–97, 71 S.Ct. 456, 95 L.Ed. 456 (1951).

The most difficult problem facing the reviewing court arises when, as in this case, the Board and the administrative law judge disagree on the facts. The Supreme Court has given the following general guidance to the courts of appeals faced with such a Board-administrative law judge conflict.

We do not require that the examiner's findings be given more weight than in reason and in the light of judicial experience they deserve. The "substantial evidence" standard is not modified in any way when the Board and its examiner disagree. We intend only to recognize that evidence supporting a conclusion may be less substantial when an impartial, experienced examiner who has observed the witnesses and lived with the case has drawn conclusions different from the Board's than when he has reached the same conclusion. The findings of the examiner are to be considered along with the consistency and inherent probability of testimony. The significance of his report, of course, depends largely on the importance of credibility in the particular case.

*Id.* at 496, 71 S.Ct. at 169.

Although this guidance is assertedly as precise as the nature of the problem permits,[1] an analysis of both the cases, with emphasis on their facts, and basic policy considerations provides additional guidance to judicial review. Turning first to the cases, we have found no decision, nor has one been cited to us, sustaining a finding of fact by the Board which rests *solely* on testimonial evidence discredited either expressly or by clear implication by the administrative law judge.[2] A typical case

---

1. *See NLRB v. Interboro Contractors, Inc.*, 388 F.2d 495, 499 (2d Cir. 1967); *Bon–R Reproductions, Inc. v. NLRB*, 309 F.2d 898, 903 (2d Cir. 1962).

2. Several cases, however, have upheld factual determinations by the Board that rested on only slight (but not discredited) evidence in the record or on inferences drawn from such evidence. For example, in *NLRB v. Jackson Maintenance Corp.*, 283 F.2d 569 (2d Cir. 1960),

demonstrating the need for independent, credited evidence is *Amco Electric v. NLRB*, 358 F.2d 370 (9th Cir. 1966). There the legality of a discharge turned on a narrow question of fact: Did the discharged employee use the company's car radio to give orders to another employee or merely to contact the union steward? The trial examiner (now referred to as an administrative law judge) discredited the testimony of both the discharged employee and the employee receiving the call. The Board, however, disagreed and accepted the discharged employee's version. In refusing to enforce the Board's order against the company, we stated:

> Considering the record as a whole *the only evidence* which we believe supports the Board's findings is the [discredited] testimony of the [discharged employee]. While the Board is not bound by the credibility determinations of the trial examiner, nevertheless the probative weight which may be properly given to testimony is severely reduced when an impartial experienced examiner who has observed the witnesses and lived with the case has drawn different conclusions.

*Id.* at 373 (emphasis added; footnote omitted).

A similar case is *Ward v. NLRB*, 462 F.2d 8 (5th Cir. 1972). A discharged non-union, non-local employee brought unfair labor charges against his former employer and a union, alleging that they had caused his discharge because he was not a union member. The determinative factual question was the union's motive for insisting on his discharge—either to secure employment for local residents (regardless of their union affiliation) or to secure employment only for union members. The union's evidence consisted solely of the testimony of union officials. By clear implication, the trial examiner discredited that testimony and found against the union. The Board reversed. The Fifth Circuit reinstated the trial examiner's decision, explaining that

> when the ultimate determination of motive or purpose hinges entirely upon the degree of credibility to be accorded the testimony of interested witnesses, "the credibility findings of the Trial Examiner are entitled to special weight and are not to be easily ignored." . . . The preeminence of the Examiner's conclusions regarding testimonial probity does not amount to an inflexible rule that either the Board or a reviewing court must invariably defer to his decision, thereby effectively nullifying either administrative or judicial review. But when the Board second-guesses the Examiner and gives credence to testimony which he has found—either expressly or by implication—to be inherently untrustworthy, the substantiality of that evidence is tenuous at best.
>
> Here the Board's finding that the union's motive in seeking [the non-union employee's] discharge was to secure employment for local residents, rests for the most part, if not entirely, upon such Examiner-discredited testimony. There is *no other direct or circumstantial evidence* in the record from which that inference could have been drawn.

*Id.* at 12 (emphasis added; citations & footnotes omitted).

---

only two witnesses came before the trial examiner, the charging employee and his employer. The employee testified that the employer, in a conversation between the two, attempted to make non-membership in the union a condition of employment. The employer denied the conversation. The trial examiner expressly discredited the testimony of the employer. But the examiner also had difficulty with the employee's testimony and concluded that it was not reliable. On this assessment of the evidence, the examiner held that there was insufficient trustworthy evidence to hold that the employer had committed an unfair labor practice. The Board disagreed and found an unfair labor practice, and the Second Circuit granted enforcement.

Importantly for our purposes, the court in *Jackson Maintenance* referred to evidence *other than* the employee's testimony (e. g., the inference that could be drawn from the trial examiner's conclusion that the employer lied about the crucial conversation) that supported the Board's ultimate conclusion. The court seemed to view the Board's conclusion as compatible with the trial examiner's overall assessment of credibility rather than as in disagreement with it.

*See also NLRB v. Interboro Contractors, Inc.,* *supra,* 388 F.2d at 499, 501.

■ The cases also demonstrate that, even when the record contains independent, credited evidence supportive of the Board's decision, a reviewing court will review more critically the Board's findings of fact if they are contrary to the administrative law judge's factual conclusions. *NLRB v. Tom Johnson, Inc.*, 378 F.2d 342, 344 (9th Cir. 1967). This more rigorous review follows necessarily from the Supreme Court's statement in *Universal Camera Corp. v. NLRB, supra*, 340 U.S. at 488, 71 S.Ct. at 464, that the "substantiality of evidence [in support of the Board's decision] must take into account whatever in the record fairly detracts from its weight." In response to *Universal Camera*, the Second Circuit has correctly observed that

> the Board's supporting evidence, in cases where it rejects the examiner's findings, must be stronger than would be required in cases where the findings are accepted, since in the former cases the supporting evidence must be deemed substantial when measured against the examiner's contrary findings as well as the opposing evidence.

*NLRB v. Interboro Contractors, Inc.*, 388 F.2d 495, 499 (2d Cir. 1967). Thus, evidence in the record which, when taken alone, may amount to "substantial evidence" and therefore support the Board's decision, will often be insufficient when the trial examiner has, on the basis of the witnesses' demeanor, made credibility determinations contrary to the Board's position. *See, e. g., NLRB v. Four Winds Industries, Inc.*, 530 F.2d 75, 79–80 (9th Cir. 1976); *Pittsburgh-Des Moines Steel Co. v. NLRB*, 284 F.2d 74 (9th Cir. 1960).

This last point is well illustrated by *Pittsburgh-Des Moines Steel Co. v. NLRB, supra*, 284 F.2d 74. The controlling factual question centered on the company's motive for giving or withholding Christmas bonuses: Was the purpose to discourage protected concerted activity or to further a compensation scheme based on valid business considerations? The trial examiner credited the company's witness and discredited the opposing testimony of the union's witnesses. The Board reversed "by refusing to accept the Trial Examiner's belief in [the employer's witness's] testimony yet believing the testimony of others whom the Trial Examiner refused to credit." *Id.* at 87. We reinstated the trial examiner's decision, stating that the Board should not "be permitted either to draw unwarranted inferences to reverse a finding of credibility made by the Trial Examiner or to discard positive findings of credence in favor of inferences drawn from tenuous circumstances." *Id.* Importantly, the record contained independent, credited (or at least not discredited) evidence from which the Board could and did draw inferences contrary to the trial examiner's findings. Those inferences, unquestionably within the realm of the Board's expertise, may have constituted, standing alone, substantial evidence. But their weight was diminished by opposing determinations of credibility made by the trial examiner.

We also conclude that basic policy considerations support the course these cases have taken and particularly the distinction often made in the cases between credibility determinations based on demeanor—sometimes referred to as *testimonial inferences, see NLRB v. Universal Camera Corp.*, 190 F.2d 429, 432 (2d Cir. 1951) (Frank, J., concurring), *on remand from* 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951)—and inferences drawn from the evidence itself—sometimes referred to as *derivative inferences. Id.* These policy considerations can be illuminated by reference to the source of the deference accorded an administrative law judge's findings and the different source of the deference accorded the Board's findings.

Weight is given the administrative law judge's determinations of credibility for the obvious reason that he or she "sees the witnesses and hears them testify, while the Board and the reviewing court look only at cold records." *NLRB v. Walton Manufacturing Co.*, 369 U.S. 404, 408, 82 S.Ct. 853, 855, 7 L.Ed.2d 829 (1962). All aspects of the witness's demeanor—including the expression of his countenance, how he sits or stands, whether he is inordinately nervous,

his coloration during critical examination, the modulation or pace of his speech and other non-verbal communication—may convince the observing trial judge that the witness is testifying truthfully or falsely. These same very important factors, however, are entirely unavailable to a reader of the transcript, such as the Board or the Court of Appeals. But it should be noted that the administrative law judge's opportunity to observe the witnesses' demeanor does not, by itself, require deference with regard to his or her derivative inferences. Observation of demeanor makes weighty only the observer's testimonial inferences.

Deference is accorded the Board's factual conclusions for a different reason—Board members are presumed to have broad experience and expertise in labor-management relations. *See NLRB v. Miller Redwood Co.*, 407 F.2d 1366, 1369 (9th Cir. 1969). Further, it is the Board to which Congress has delegated administration of the Act. The Board, therefore, is viewed as particularly capable of drawing inferences from the facts of a labor dispute. Accordingly, it has been said that a Court of Appeals must abide by the Board's derivative inferences, if drawn from not discredited testimony, unless those inferences are "irrational," *NLRB v. Universal Camera Corp., supra*, 190 F.2d at 432, "tenuous" or "unwarranted." *Pittsburgh-Des Moines Steel Co. v. NLRB, supra*, 284 F.2d at 87. As already noted, however, the Board, as a reviewing body, has little or no basis for disputing an administrative law judge's testimonial inferences.

The distinction between testimonial inferences and derivative inferences, and between the respective vantage points of administrative law judges and the Board, is well developed in our decision in *NLRB v. Miller Redwood Co., supra*, 407 F.2d 1366.

There the trial examiner and the Board disagreed on the employer's motive for discharging an employee. We upheld the Board's position, noting that the Board disagreed only with the trial examiner's "ultimate conclusion," which was necessarily based on derivative inferences. *Id.* at 1369. We were careful to point out that the Board did not disturb the examiner's resolution of conflicting testimony, that is, his conclusions regarding credibility based on demeanor. *Id.* "The disagreement related solely to the inferences to be drawn from the whole record and the proper application of the statute. In such a case, 'the presumptively broader gauge and experience of members of the Board have a meaningful role.'" *Id.* (citations omitted).[3]

We emphasize that we do not hold that the administrative law judge's determinations of credibility based on demeanor are conclusive on the Board. Many circuits, including ours, have held that they are not. *See, e. g., Amco Electric v. NLRB*, 358 F.2d 370, 373 (9th Cir. 1966); *Ward v. NLRB*, 462 F.2d 8, 12 (5th Cir. 1972); *NLRB v. Jackson Maintenance Corp., supra*, 283 F.2d at 570. We simply observe that the special deference deservedly afforded the administrative law judge's factual determinations based on testimonial inferences will weigh heavily in our review of a contrary finding by the Board. In our view, this position is mandated by the Supreme Court's instruction that "[t]he significance of [the administrative law judge's] report, of course, depends largely on the importance of credibility in the particular case." *Universal Camera Corp. v. NLRB, supra*, 340 U.S. at 496,[4] 71 S.Ct. at 469.

Recognition of the distinction between testimonial inferences and derivative inferences, and an appreciation of the different sources of deference accorded the Board

---

**3.** For another case that carefully distinguishes between testimonial inferences and derivative inferences, *see NLRB v. Interboro Contractors, Inc., supra*, 388 F.2d at 499–501.

**4.** Our conclusion that the hearing officer's determinations based on testimonial inferences are entitled to added deference in our review process is a logical and proper extension of the

Supreme Court's suggestion that the Board itself should be "influenced by the examiner's opportunity to observe the witnesses he hears and sees and the Board does not." *Universal Camera Corp. v. NLRB, supra*, 340 U.S. at 495, 71 S.Ct. at 468. *See* R. Gorman, Labor Law § 4, at 12 (1976).

**1080**

and the administrative law judge, provide helpful guidance in those cases where the Board and the administrative law judge disagree about the facts. That recognition and appreciation do not, however, eliminate all difficulty for the reviewing court. Cases may still arise where the administrative law judge's position is well supported by testimonial inferences, while the contrary position of the Board is equally well supported by valid derivative inferences.

## II.

Applying these principles of judicial review to the present case, we conclude that the record considered as a whole does not contain substantial evidence of unfair labor practices.

### A. Threats and Coercive Interrogation

■ The law regarding employer threats to and interrogations of employees is not in dispute here. Section 7 of the Act, 29 U.S.C. § 157, grants employees "the right to self-organization, to form, join or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining." Section 8(a)(1) of the Act, 29 U.S.C. § 158(a)(1), implements this guarantee by making it an unfair labor practice to "interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section [7]." In light of this statutory language, the law regarding threats, at least of the type alleged in this case, needs no elaboration. Employer interrogation of employees regarding their concerted activities, however, requires some further comment. Such interrogation is not deemed per se unlawful. *NLRB v. Super Toys, Inc.*, 458 F.2d 180, 182 (9th Cir. 1972); *NLRB v. Sellers*, 346 F.2d 625, 632 (9th Cir. 1965). Some circumstances, such as, for example, an express reassurance by the employer of no retaliation or a history of free and open discussion of union activities, may preclude any possibility of coerciveness. Accordingly, the test is whether, under all the circumstances, the interrogation reasonably tends

to restrain or interfere with the employees in the exercise of their protected rights. *E. g., Meat Cutters Local No. 364 v. NLRB*, 435 F.2d 668, 669 (9th Cir. 1970); *Hughes & Hatcher, Inc. v. NLRB*, 393 F.2d 557, 562–63 (6th Cir. 1968); *Dieckbrader Express, Inc.*, 168 N.L.R.B. 867, 869 (1967); *Frito-Lay, Inc.*, 151 N.L.R.B. 28, 34 (1965).

In this case, the section 8(a)(1) charge is based on three separate incidents occurring over a six-month period coinciding with union efforts to organize some of Penasquitos' employees.

#### 1. November 1973: The Rooftop Conversation

Employee Ruiz testified on direct examination that sometime in November 1973, supervisor Zamora, employee Hernandez and he were working on a roof when

we saw Joe Alvarado [union field representative and organizer] drive up and so Jesus Zamora asked me who was that guy, you know. We thought he was a narc because of his car. And I told him he was from the Union. And he asked me who let the Union in, and I told him I didn't know. And then he said whoever did was probably going to get his [expletive deleted] laid off.

On cross-examination, Ruiz testified that when the car drove up, Zamora asked who the man was and he, Ruiz, responded that he did not know. In response to questions by the administrative law judge, Ruiz denied that he had told Zamora that the man was from the union because "I was too scared to tell him." According to Ruiz, Zamora, after getting down from the roof, learned the man's identity from another supervisor. Zamora testified that employees discussed the union with him openly and freely during work, that he thought at that time that the employees were already affiliated with the union, and that he had believed union representation was good because the employees were underpaid.

■ In light of this conflicting testimony, the administrative law judge was faced with a clear-cut question of credibility. He believed Zamora, whom he characterized

"as an honest and forthright witness," and disbelieved Ruiz, whose testimony he characterized as "equivocal." The Board, on the basis of its own testimonial inferences, reversed this finding.[5] There was no independent testimonial evidence or permissible derivative inferences to support the Board's conclusion that the threat was actually made. Accordingly, we overturn the Board's factual conclusion because it is not based on substantial evidence.

### 2. November 1973: The Hernandez Conversation

Employee Hernandez testified that in November 1973, while in the same room with Zamora, Zamora

> called me and asked me if I went into the Union and signed for them. I told him that this was the most convenient thing for everyone. For himself as well as us. And that is all.
>
> .    .    .    .    .
>
> [Zamora] just smiled and left.

On cross-examination, Hernandez told essentially the same story, testifying that Zamora called to him, "Hey, Ricardo, if you can, if the Union comes in, are you going to sign with them? And I said, that is the most convenient thing for all of us."

The administrative law judge assumed that the conversation occurred, as testified to by Hernandez. Nevertheless, he refused to find an unfair labor practice because, under the circumstances, the conversation was not coercive. Particularly, in his view, General Counsel failed to establish, in conjunction with the interrogation, any employer anti-union animus that would supply the element of coercion.

■ General Counsel and the Board argue several circumstances in support of a finding of coercion. One is the alleged threat voiced by Zamora to Ruiz earlier in November. (Hernandez, who was working with the two, testified that he did not hear the threat.) We have already sustained the administrative law judge's finding that the

threat was not made. The other incident put forward by the Board to show anti-union animus (the "timeclock" incident) is discussed in more detail in part II,A,3, *infra.* It is enough for our purposes here to note, first, that the alleged timeclock incident occurred in March or April of 1974, much too late to taint a November 1973 conversation, and second, whether the incident occurred at all or as described by General Counsel's witnesses is essentially a question of credibility. The administrative law judge did not believe those witnesses. We conclude, therefore, that the Board's conclusion regarding the Hernandez conversation is not supported by substantial evidence.

### 3. April 1974: The Cuevas Conversation

Employee Cuevas testified that on April 4, 1974, following an injury and a trip to the doctor, he was sitting in the cafeteria when Zamora came in. Cuevas testified that during the conversation that ensued,

> I asked him if it was possible to go into the Union. And he answered me that it was possible because the [expletive referring to unions deleted], when they got a company, they didn't let go of it, until they got it in the Union. That it was not possible to go in right away, but later on he was going in. Then he asked me who was the one who started the [expletive deleted] with the Union. And I answered that it was Tony Rios and Ysidro Martinez, Ramon Valdez [and] Rodriguez.

Cuevas testified on cross-examination that Zamora did not ask him how he felt about the union, tell him not to join the union, express any feeling about whether the union was good or bad for the employees, or threaten to terminate anyone if they joined the union.

Zamora testified that he remembered talking to Cuevas following his injury and that while he could not relate the conversation, he thought that they discussed politics or the federal government. He conceded that the subject of the union may have come up because "like I said, the Union was

**5.** One member dissented generally, contending that the majority's reversal of the administrative law judge's credibility determinations was unwarranted.

discussed by everyone, you know. It was the thing." He testified that he felt all the employees "more or less" were for the union because all the employees discussed it openly during work and that he never attempted to find out which employees were doing the organizing because, through conversations with them, "I thought they were all in the Union."

In his opinion, the administrative law judge manifested some doubt that the limited query of Cuevas even occurred. Nevertheless, he based his ultimate conclusion of no violation on the absence of any coerciveness surrounding the conversation. He expressly credited Zamora's testimony, including the references to the practice of free and open discussion of the union by employees and supervisor, even during working hours. He also noted, as we do, the important fact that Cuevas, not Zamora, initiated the conversation about the union.

The Board, in reversing the administrative law judge's conclusions, relied on both discredited testimony and what can only be characterized as tenuous inferences. The discredited testimony concerned a purported conversation between Zamora and another supervisor at the timeclock. Former employee Rios testified that

> Zamora stated, while stamping his foot to the ground with anger [and referring to the employees in a obscene manner] . . that we were going into the Union and therefore we were acting smart. But even so, he could fire us and he was going to do it.

On cross-examination, he testified that Zamora, stamping his foot, stated,

> They think they are very smart because the Union is coming in. But whether it comes in or not, whether the Union comes in or not, I am going to try and I believe I am going to be able to fire them.

Employee Ruiz testified that he overheard Zamora use the same obscene expletive and then say "just because they think they are getting the Union in, they are going to do whatever they feel like doing. [Expletive deleted]!" Asked specifically by General Counsel if Zamora mentioned the word "fire" during the conversation, Ruiz responded that he had not.

The administrative law judge, as he did several other times in his decision, discredited Rios' testimony in the strongest terms. He noted further that "Rios' animosity toward Zamora was evident throughout his testimony" and that Rios "fabricated facts in an effort to make Zamora appear as a scoundrel." General Counsel, however, argues that the administrative law judge did not expressly discredit Ruiz' testimony. Ruiz did not, of course, testify that Zamora made references to firing employees, but the language he ascribed to Zamora, particularly the obscene expletives, could support a finding of anti-union animus. General Counsel, and the Board to the extent that it relies on this incident, fail, however, to give the administrative law judge's decision a fair reading. By clear implication, he did not accept Ruiz' recitation of the alleged conversation at the timeclock.

■ The Board's inferences from not discredited testimony are more "tenuous" and "arbitrary" than the inferences to which we affixed those labels in *Pittsburgh-Des Moines Steel Co. v. NLRB, supra,* 284 F.2d 74. The Board inferred that employee-supervisor relations were not friendly and open but rather hostile and tainted with anti-union animus, because Zamora testified that he was "a quiet dude," did not eat lunch with the employees, and once, more than two years prior to the incidents involved here, was run off the road by a disgruntled employee discharged for failure to work. Although such a derivative inference may have some weight standing alone, the contrary conclusions of the administrative law judge, based on testimonial inferences, make the substantiality of the Board's inference almost negligible.

## B. The Discharges

■ It is axiomatic that an employer's discharge of an employee because of his union activities or sympathies violates section 8(a)(3) of the Act, 29 U.S.C. § 158(a)(3). We have stated that "the cases are legion

that the existence of a justifiable ground for discharge will not prevent such discharge from being an unfair labor practice if partially motivated by the employee's protected activity; a business reason cannot be used as a pretext for a discriminatory firing." *NLRB v. Ayer Lar Sanitarium,* 436 F.2d 45, 50 (9th Cir. 1970); *see NLRB v. Miller Redwood Co., supra,* 407 F.2d at 1370. The determinative factual issue, therefore, is the employer's motive.

In this case, the administrative law judge and the Board disagreed on Penasquitos' motive. Whether, in light of this disagreement, the Board's conclusion is sustainable because it is based on substantial evidence is an extremely close question. We conclude, however, that the Board's finding of improper motive cannot be sustained, primarily because a significant number of the Board's derivative inferences were drawn from discredited testimony.

The keystone of the administrative law judge's finding of proper motive was his conviction that Zamora told the truth. Zamora testified that he observed Rios and Martinez working slowly and watching several women sunbathe in bikinis some distance from the employees' worksite. Upset with their performance, Zamora approached Rios and Martinez and stated that "if you want to see girls wearing bikinis there were some better ones at the beach." Zamora then left, verified with his superior that he had authority to fire, returned and discharged the two men. At the hearing before the administrative law judge, Martinez admitted that he was working at a slow pace on the day he was fired.

The administrative law judge relied on other evidence also. Several months prior to the discharge, Zamora and another supervisor watched for 5 or 10 minutes while Rios and two other employees stood under a tree, doing no work. When Zamora approached and demanded an explanation, the employees stated that they had no work to do and were waiting for quitting time. Zamora then suspended them—a fact initially denied by the mendacious Rios during cross-examination but later clearly established.

In reaching a contrary conclusion regarding Zamora's motive, the Board relied on a variety of inferences. First, the Board transferred to Zamora's action in discharging Rios and Martinez the anti-union animus it found in his alleged threats and unlawful interrogations. But, as we concluded in part II,A, *supra,* that finding of anti-union animus was not supported by substantial evidence. The Board also ascribed an improper motive to Zamora for the discharge because of his alleged statements at the timeclock. Again, the witnesses testifying about that incident were not credited by the administrative law judge, *see* part II,A,3, *supra,* thus vitiating the inference the Board attempted to draw from it.

The Board also relied on the fact that Martinez and Rios had signed authorization cards for the union and that Cuevas had informed Zamora that those two, among others, were the leaders of the organizing effort. But against this must be placed the credited testimony of Zamora that he was unconcerned about who was doing the organizing because "I thought they were all in the Union . . . ."

The Board drew two inferences, however, from uncontroverted facts. First, the discharge was abrupt. Rios and Martinez received no warning prior to their discharge that a failure to speed up their work would result in termination. Second, the discharge came only two days after the Board's Regional Director issued a Decision and Direction of Election ordering an election among the Penasquitos employees under Zamora's supervision. These derivative inferences undoubtedly carry weight, which is not diminished by the fact that the administrative law judge drew a contrary inference from the timing of the discharge. As noted before, special deference is accorded the Board when, in the application of its expertise and experience, it derives such inferences from the facts of a labor dispute. *See NLRB v. Miller Redwood Co., supra,* 407 F.2d at 1369.

But in this case, credibility played a dominant role. The administrative law

judge's testimonial inferences reduce significantly the substantiality of the Board's contrary derivative inferences. Particularly, removing the Board's finding of anti-union animus based upon alleged unlawful threats and interrogations, *see* part II,A, *supra*, leaves poorly substantiated the Board's other conclusion that the discharges were improperly motivated. Considering the record as a whole, we conclude that the Board's conclusion that Penasquitos committed unlawful labor practices is not supported by substantial evidence and must, therefore, be set aside.

ENFORCEMENT DENIED, ORDER SET ASIDE.

DUNIWAY, Circuit Judge (concurring in part and dissenting in part):

I concur in the result reached in part II A of Judge Wallace's opinion, but I have some reservations about the rationale by which that result is reached. I dissent from part II B of the opinion, and would enforce the part of the Board's order that is considered in part II B.

## I.

My reservations relate to Judge Wallace's adoption of the dichotomy between "credibility determinations based on demeanor . . . *testimonial inferences*" and those based on "inferences drawn from the evidence itself—. . . *derivative inferences*. . . ." This distinction he finds in a concurring opinion of Judge Frank in *NLRB v. Universal Camera Corp.*, 2 Cir., 1951, 190 F.2d 429, 432, on remand from *Universal Camera Corp. v. NLRB*, 1951, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456. Judge Wallace is careful to emphasize that the administrative law judge's determinations of credibility are not conclusive, but I am concerned lest the dichotomy that he adopts may result in future decisions that are merely mechanical applications of labels, which hinder rather than help the intelligent and principled application or growth of the law. I fear that Judge Wallace's opinion may have just such an effect, one which, I am sure, he does not intend, and which he properly disavows.

The notion that special deference is owed to the determination of a trier of fact, whether judge, trial examiner, hearing officer ("administrative law judge"), or jury, because the trier "sees the witnesses and hears them testify, while the Board and the reviewing court look only at cold records," *NLRB v. Walton Manufacturing Co.*, 1962, 369 U.S. 404, 408, 82 S.Ct. 853, 855, 7 L.Ed.2d 829, is deeply imbedded in the law. There must be thousands of appellate decisions that state and restate it in an infinite variety of ways. I could not disregard it if I would; indeed, I have no desire to do so. As a generalization, it is unassailable.

In his opinion, Judge Wallace fleshes it out:

All aspects of the witnesses's demeanor—including the expression of his countenance, how he sits or stands, whether he is inordinately nervous, his coloration during critical examination, the modulation or pace of his speech and other nonverbal communication—may convince the observing trial judge that the witness is testifying truthfully or falsely. These same very important factors, however, are entirely unavailable to a reader of the transcript, such as the Board or the Court of Appeals.

Here is where I begin to have difficulty. I venture to suggest that, as to every one of the factors that Judge Wallace lists, one trier of fact may take it to indicate that the witness is truthful and another may think that it shows that the witness is lying.

I am convinced, both from experience as a trial lawyer and from experience as an appellate judge, that much that is thought and said about the trier of fact as a lie detector is myth or folklore. Every trial lawyer knows, and most trial judges will admit, that it is not unusual for an accomplished liar to fool a jury (or, even, heaven forbid, a trial judge) into believing him because his demeanor is so convincing. The expression of his countenance may be open and frank; he may sit squarely in the chair, with no squirming; he may show no nervousness; his answers to questions may be

clear, concise and audible, and given without hesitation; his coloration may be normal—neither pale nor flushed. In short, he may appear to be the trial lawyer's ideal witness. He may also be a consummate liar. In such a case, the fact finder may fit Iago's description of Othello:

> The Moor is of a free and open nature,
> That thinks men honest that but seem to be so;
> And will as tenderly be led by the nose as asses are.
>
> (Othello, Act 1, Sc. 3, 1. 405–8)

On the other hand, another fact finder seeing and hearing the same witness may conclude that he is just too good a testifier, that he is an expert actor, and that he is also a liar.

Conversely, many trial lawyers, and some trial judges, will admit that the demeanor of a perfectly honest but unsophisticated or timid witness may be—or can be made by an astute cross-examiner to be—such that he will be thought by the jury or the judge to be a liar. He may be unable to face the cross-examiner, the jury, or the judge; he may slouch and squirm in the chair; he may be obviously tense and nervous; his answers to questions may be indirect, rambling, and inaudible; he may hesitate before answering; he may alternately turn pale and blush. In short, he may, to the trier of fact, be a liar, but in fact be entirely truthful. Again, however, another fact finder, seeing and hearing the same witness, may attribute his demeanor to the natural timidity of the average not very well educated and non-public sort of person when dragged to court against his will and forced to testify and face a hostile cross-examiner, and conclude that the witness is telling the truth.

While there are innumerable cases that state and restate the importance of a witness's demeanor to the trier of fact, there are very few that deal with the proper effect of this or that aspect of demeanor. Those that I can find tend to confirm my view that myth and folklore are involved.

In *Quercia v. United States,* 1933, 289 U.S. 466, 53 S.Ct. 698, 77 L.Ed. 1321, the Supreme Court reversed because the trial judge had commented to the jury:

> And now I am going to tell you what I think of the defendant's testimony. You may have noticed, Mr. Foreman and gentlemen, that he wiped his hands during his testimony. It is rather a curious thing, but that is almost always an indication of lying. Why it should be so we don't know, but that is the fact. I think that every single word that man said, except when he agreed with the Government's testimony, was a lie.

289 U.S. at 468, 53 S.Ct. at 698.

In *People v. Patubo,* 1937, 9 Cal.2d 537, 71 P.2d 270, the California Supreme Court reversed a murder conviction when the trial judge commented:

> Now you can see this man's manner of testifying in the courtroom when he was on the witness stand. He had that hangdog look of a guilty man. He could not talk hardly above a whisper and he could not talk so the court could hear him. . .
> If ever a man by his appearance and his manner of giving testimony has shown himself to be a willful, deliberate and outright perjurer as to material facts in a case, the defendant in this case has been it.

71 P.2d at 272.

In *United States v. Meltzer,* 7 Cir., 1938, 100 F.2d 739, the trial judge said to the jury:

> But that brother in law of Mrs. Lage, Oscar Ellefson; he looked to me and he seemed to me like an honest man, I can't see any reason why he, with his responsible position, with the Wisconsin Telephone Company, why he should be here telling anything other than the truth. *He is not accustomed to courts. Maybe this was the first time that he has ever been in a court, and he meticulously tried to tell the truth* ; therefore, he was slow in his testimony; his mind doesn't operate very rapidly, at best; he works out on construction jobs; he seemed to me like an honest man; . . .

(Emphasis in original) 100 F.2d at 742. The Seventh Circuit reversed.

In *People v. Earl*, 1935, 10 Cal.App.2d 163, 166, 51 P.2d 147, 148, the trial judge characterized a witness's testimony as follows: "I have tried to get this witness to speak like a man, but it doesn't seem to do any good. He doesn't seem to want the jury to hear his testimony." The judge later cross-examined the same witness as to whether or not he *ever* told the truth. The appellate court found these statements to be error, but harmless.

The Labor Board itself has refused to accept a trial examiner's credibility findings when they were supported by comments like this:

> To credit her, youthful, buxom and attractive as she was, and to disregard the contradictory testimony of many less fancy, but more solid people would require the trier of fact to be completely "bewitched, bothered and bewildered." *Hadley Manufacturing Corp.*, 1954, 108 N.L.R.B. 1641, 1644.

Finally, in *Dworkis v. Dworkis*, 1959, Fla. App., 111 So.2d 70, a Florida appellate court overturned a lower court decision in which "[t]he chancellor believed the husband and disbelieved the wife; and in absence of other corroboration, found corroboration for the husband's testimony regarding adultery in the demeanor and attitude of the wife during the trial." 111 So.2d at 74. However, the opinion does not mention exactly why the witness's *demeanor* indicated that she had committed adultery. One might perhaps be excused for wondering about it.

I write to suggest that Judge Wallace's dichotomy should not be taken to protect the myth and folklore behind an almost impenetrable wall. I do not want fact finders to believe that to make their findings almost totally unassailable they need only use the right incantation: "I don't (or I do) believe him because of his demeanor," or "on the basis of testimonial inferences."

I doubt if there are many cases in which the fact finder relies on demeanor alone. There may not be any; I hope that there are none. I think that in every case in which he thinks about what he is doing, the fact finder should and does consider both the demeanor of the witness and what he says—the content of his testimony—and weighs those factors in relation to the fact finder's knowledge of life's realities, the internal consistency of what the witness is saying, and its consistency, or lack of it, with the other evidence in the case, testimonial, documentary, and physical. The fact finding as to credibility of the witness should be, and is, based on all of these things. Judge Wallace's dichotomy seems to me to give to demeanor a more important effect than it ought to be given, considering the inherent ambiguities in demeanor itself. Anyone who really believes that he can infallibly determine credibility solely on the basis of observed demeanor is naive.

I do not at all mean to suggest that the demeanor of a witness is not, or ought not to be, an important factor in the process of fact finding. The law would not permit me to so hold if I wished to, and I do not wish to. But I am wary of overemphasizing demeanor. As Judge Merrill said when speaking for this court in *Carbo v. United States*, 9 Cir., 314 F.2d 718 at 749:

> Credibility involves more than demeanor. It apprehends the over-all evaluation of testimony in the light of its rationality or internal consistency and the manner in which it hangs together with other evidence.

We need a bit more play in the joints of the reviewing process than I discern in Judge Wallace's analysis, and this is particularly true when we deal with review by the Board, which the law makes the primary fact finder, of the findings of its own delegate, its Administrative Law Judge. The Board should have, and does have, more leeway in making its own findings, and in rejecting findings of its trial examiners, than we have in reviewing the Board's findings or those of a trial judge or jury. *Universal Camera Corp. v. NLRB*, 1951, 340 U.S. 474, 492, 71 S.Ct. 456, 467, 95 L.Ed. 456:

Section 10(c) of the Labor Management Relations Act provides that "If upon the preponderance of the testimony taken the Board shall be of the opinion that any person named in the complaint has engaged in or is engaging in any such unfair labor practice, then the Board shall state its findings of fact . . . ." 61 Stat. 147, 29 U.S.C. (Supp. III) § 160(c). The responsibility for decision thus placed on the Board is wholly inconsistent with the notion that it has power to reverse an examiner's findings only when they are "clearly erroneous."

I conclude that Judge Lumbard was right when he said in *NLRB v. Interboro Contractors, Inc.*, 2 Cir., 1967, 388 F.2d 495, at 499:

> While the standard set forth in *Universal Camera* is imprecise, "it provides as much clarity as the area affords." *Bon-R Reproductions Inc. v. NLRB*, 309 F.2d 898 (2 Cir. 1962).

## II.

Having stated my doubts about Judge Wallace's dichotomy, I nevertheless agree with the result that he reaches in part II A of his opinion. The evidence as a whole, including the credibility rulings of the administrative law judge, seems to me too thin to be called substantial support for the Board's findings. I therefore concur in the result stated in part II A.

## III.

I do not concur in part II B. As Judge Wallace observes, the question is "extremely close." In such a case, I give more weight to the experience and expertise of the Board than he does. I refer particularly to the two uncontradicted facts, the abruptness and the timing of the discharges. I cannot say that the inferences that the Board drew from these facts are "irrational" or "tenuous" or "unwarranted" (Judge Wallace's opinion at 1079), or "arbitrary" (*id.* at 1082).

I would enforce that part of the Board's order that deals with the discharges of Rios and Martinez.

CHOY, Circuit Judge (concurring):

I concur in the results reached by Judge Wallace in both parts II A and II B.

However, I share the concern that Judge Duniway feels about Judge Wallace's treatment of demeanor evidence and testimonial inferences. I, therefore, concur in Judge Duniway's eloquent exposition of his reservations contained in part I of his concurring and dissenting opinion.