**NOT FOR PUBLICATION**

**FILED**

UNITED STATES COURT OF APPEALS

OCT 9 2024

FOR THE NINTH CIRCUIT

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

| | |
|---|---|
| NICOLE OEUVRAY, | No. 23-3128 |
| Petitioner, | NLRB No. 31-CA-268924 |
| v. | MEMORANDUM* |
| NATIONAL LABOR RELATIONS BOARD, | |
| Respondent. | |

On Petition for Review of an Order of the
National Labor Relations Board

Submitted October 7, 2024**
San Francisco, California

Before: McKEOWN, KOH, and JOHNSTONE, Circuit Judges.

Nicole Oeuvray petitions for review of the order by the National Labor

Relations Board ("NLRB") dismissing her unfair labor practice complaint against

Art Directors Guild, Local 800, IATSE ("the Guild"). We have jurisdiction under

---

\* This disposition is not appropriate for publication and is not precedent except as provided by Ninth Circuit Rule 36-3.

\*\* The panel unanimously concludes this case is suitable for decision without oral argument. *See* Fed. R. App. P. 34(a)(2).

29 U.S.C. § 160(f), also known as section 10(f) of the National Labor Relations Act. We deny the petition.

1.    In reviewing orders of the NLRB, "we must uphold the agency's decision if it correctly applied the law and its factual findings are supported by substantial evidence." *NLRB v. Nexstar Broad., Inc.*, 4 F.4th 801, 805–06 (9th Cir. 2021) (internal quotation marks omitted). Substantial evidence "means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," after considering "the whole record." *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477, 488 (1951). Additionally, although the findings of an "impartial, experienced" administrative law judge ("ALJ") "who has observed the witnesses and lived with the case" are "to be considered along with the consistency and inherent probability of testimony," the "'substantial evidence' standard is not modified in any way" simply because the NLRB disagrees with the ALJ. *Id.* at 496–97.

2.    Substantial evidence supports the NLRB's finding that the Guild would have terminated Oeuvray even in the absence of her protected union activities. The NLRB assumed without deciding that Oeuvray's protected union activities were a motivating factor in her termination but concluded that the Guild would have terminated her anyway. In support of this conclusion, the NLRB found that Guild executives had been dissatisfied with Oeuvray's work

performance, had complained about her performance for several years beginning in 2016, and had specifically expressed a desire to terminate her in February 2019—before Oeuvray began her (ultimately successful) efforts to unionize Guild staffers in March 2019. Oeuvray disputes this finding on the basis that the ALJ had found the testimony of Guild executives Oana Miller and Chuck Parker describing her history of poor performance as not credible, but the NLRB found "no basis for reversing" the ALJ's credibility findings. Accordingly, Oeuvray contends, the NLRB could not rely on any evidence from Miller and Parker, such as the February 2019 emails, in support of its conclusion.

Oeuvray's contention lacks merit. The NLRB permissibly relied upon Miller and Parker's emails predating Oeuvray's protected union activities even though the ALJ determined that Miller and Parker were not credible witnesses at trial. As we have recognized, although an ALJ is best positioned to observe a witness's demeanor on the stand, the NLRB is best positioned to draw "derivative inferences" from the record as a whole. *Penasquitos Village, Inc. v. NLRB*, 565 F.2d 1074, 1078–79 (9th Cir. 1977). In any event, the ALJ's decision never suggested that Miller and Parker's emails predating Oeuvray's union activities—as opposed to their trial testimony—were unreliable, so the NLRB had no such ALJ finding to reject.

Accordingly, Oeuvray's insistence that she had a "spotless" disciplinary

history prior to April 2019 is contradicted by the record. The record demonstrates that Guild management discussed their criticism of Oeuvray's work performance with her on multiple occasions dating back to 2016. Lastly, Oeuvray purports to rely on the ALJ's finding that she never received a complaint about "late or inaccurate financial reports" until April 2019. Yet Oeuvray selectively quotes the ALJ's decision, which expressly stated that Oeuvray received complaints not only in April 2019 but also in the February 23, 2019 email Oeuvray received from Miller. The record further demonstrates that Guild management's issues with Oeuvray's performance after April 2019 were the same as they were before April 2019. Oeuvray's termination in March 2020 was a direct and forewarned result of the same issue as had displeased management over the years: missing a financial reporting deadline set by her supervisors.

The record provides substantial evidence supporting the NLRB's conclusion. Even assuming that the evidence is open to reasonable conflicting interpretations, we are not empowered to "displace the Board's choice between two fairly conflicting views," even if we might have "made a different choice had the matter been before [us] de novo." *Universal Camera*, 340 U.S. at 488. In short, the record does not "compel a contrary conclusion" to that of the NLRB. *Int'l All. of Theatrical Stage Emps. v. NLRB*, 957 F.3d 1006, 1020 (9th Cir. 2020) (internal

4

quotation marks omitted).[1]

3. Oeuvray also challenges the NLRB's decision on the grounds that (1) she was not disciplined (and in fact received a merit pay increase) after a 2017 incident in which she inadvertently bounced a check, causing a "prolonged struggle" for reimbursement at the Guild; and (2) that the Guild did not discipline two other employees who did not engage in protected union activities, including an employee accused of harassment and Oeuvray's own replacement, who inadvertently issued duplicative paychecks to the Guild's salaried employees during her first month or two in the position. Assuming without deciding that such facts could help Oeuvray prove that her protected union activities were a motivating factor in the Guild's decision to terminate her, however, they do not undermine the NLRB's conclusion that the Guild would have terminated Oeuvray anyway.

**PETITION DENIED.**

---

[1] Moreover, Oeuvray does not contend that Miller and Parker's emails predating her protected union activities are *inauthentic* but rather implies that the emails fabricated reasons to terminate her. If true, then Miller and Parker indisputably intended to terminate Oeuvray even before she began engaging in protected union activities.