NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

GAIU LOCAL 13–B, GRAPHIC ARTS INTERNATIONAL UNION, Respondent.

No. 680, Docket 81–4153.

United States Court of Appeals, Second Circuit.

Argued March 31, 1982.

Decided June 11, 1982.

Ruah D. Lahey, Atty., N. L. R. B., Washington, D. C. (William A. Lubbers, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Robert E. Allen, Acting Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, N. L. R. B., Washington, D. C., of counsel), for petitioner.

Ralph P. Katz, New York City (Delson & Gordon, New York City, of counsel), for respondent.

Before FEINBERG, Chief Judge, MANSFIELD, Circuit Judge, and MISHLER, District Judge.*

MANSFIELD, Circuit Judge:

The National Labor Relations Board (the "Board") petitions pursuant to § 10(e) of the National Labor Relations Act (the "Act"), as amended, 29 U.S.C. §§ 151, *et seq.*, for enforcement of an order issued by it on September 20, 1980, against GAIU Local 13–B, Graphic Arts International Union (the "Union"), directing it to rescind its disciplinary action against 17 of its members because of their resistance to a Union ban against performing overtime work for the Western Publishing Co. (the "Employer"). The order also requires the Union to nullify its overtime ban, to compensate the disciplined members for losses suffered as a

---

* Of the United States District Court for the Eastern District of New York, sitting by designation.

result of the ban, and to post appropriate notices. We enforce the Board's order.

The Union represents employees at the Employer's Poughkeepsie plant, which publishes books and similar materials, employing some 500 persons engaged in production and related activities, driving of in-plant equipment and janitorial services. Following the expiration on May 16, 1978, of the contract between the Employer and the Union the parties negotiated while the employees continued working without a contract. Under the terms of their employment the employees were obligated to perform paid overtime work when assigned by the Employer.

On July 14, 1978, the Employer advised 13 employees that they would be suspended for one day each because of their refusal to perform assigned mandatory overtime work but postponed putting the suspensions into effect. On August 28, 1978, the Union held a membership meeting at which 320 out of a total of 490 Union members were present. The members voted 220 for and 100 against adopting a work rule, effective at once, prohibiting members from performing mandatory overtime work. On August 30, 1978, the Employer responded by discontinuing overtime work. However, in October it reinstituted overtime to meet customers' needs, first advising employees that it did not intend to discipline employees who refused to work overtime but then returning to a mandatory overtime policy. Thereafter at least 17 employees who were Union members worked overtime in violation of the Union rule banning overtime.

On October 25, the Union began disciplining each of the 17 members through internal union charges, fines and lawsuits. A $50 fine was imposed on each of these employees for each day worked overtime. Also on October 25 the Union filed with the Board a complaint alleging that the Employer had committed unfair labor practices by failing to bargain with it in good faith and by improperly communicating directly with the employees.

On December 6, 1978, a unit employee who had been fined by the Union for violating its overtime ban filed a complaint with the Board against the Union charging that the ban was an unfair labor practice. On December 7, 1978, the Employer informed the Union that because of the bargaining impasse it would on December 11 put into effect the terms of its final contract offer but would not change the work hours to 37½ hours per week, "[d]ue to [the Union's] continued threat of fines and discipline against employees who work in excess of 36¼ hours." On December 18, 1978, the Union filed a second unfair labor practice charge against the Employer, adding that it had unlawfully made unilateral changes in work conditions without a valid bargaining impasse. This was followed by a Union notice to its members on January 3, 1979, lifting the overtime ban but advising that if the Employer changed the existing 36¼-hour work week the ban would be reinstated immediately. The Employer then notified employees that it planned to put its proposed 37½-hour work week into effect when the Union ended its threats of fines and discipline. After an unsuccessful bargaining session on January 16, 1979, the Employer advised that it intended to implement the 37½-hour work week on January 22, 1979, whereupon the Union advised that the ban was "back on."

The unfair labor practice charges filed by the Union against the Employer were settled by an agreement, approved by the Regional Director, between the Board's General Counsel and the Employer, in which the Union did not participate. The charges against the Union were heard by an Administrative Law Judge ("ALJ"), who found the Union's ban against overtime to be a lawful self-help response to the Employer's unfair labor practices allegedly committed during collective bargaining. Since the charges against the Employer had been settled the ALJ declined to hear evidence as to its commission of unfair labor practices. He did, however, admit testimony of the Union's recording secretary as to what was said at the meeting at which the ban was adopted but excluded various exhibits offered by the Union to prove that the Em-

ployer had engaged in unfair labor practices. Aside from the evidence of what transpired at the meeting the Union did not offer proof to show its reasons for adopting the ban.

A three-member Board panel reversed the ALJ's decision, holding that the ban had not been adopted in response to any unfair labor practices but "solely as a bargaining tactic, designed to put economic pressure on Western [Employer] and to force Western to make bargaining concessions. . . .", 252 N.L.R.B. 936, 938. It based its finding on a record showing that the Union had filed

> "no charges . . . against Western until almost 2 months after the overtime ban was implemented, that there is no evidence of any discussion at the August 28 union meeting characterizing Western's actions as unfair labor practices, that [the Union's] notice announcing the overtime ban makes no reference to Western's alleged unfair labor practices, and that the meager evidence as to the discussion at the August 28 union meeting indicates the employees were mainly concerned with Western's failure to reach an agreement with the Union quickly." *Id.*

The Board then concluded that the Union's disciplining of members who engaged in unprotected activity (i.e., refusal to perform mandatory overtime, for which they might lawfully be subjected to suspension or discharge by the Employer) violated "an overriding policy of the labor laws," *Scofield v. NLRB*, 394 U.S. 423, 429, 89 S.Ct. 1154, 1158, 22 L.Ed.2d 385 (1969), and therefore constituted an unfair labor practice under § 8(b)(1)(A) of the Act. The Board order, which is the subject of the present petition, followed.

### DISCUSSION

■ Section 8(b)(1)(A) of the Act, 29 U.S.C. § 158(b)(1)(A), makes it an unfair labor practice for a union to "restrain or coerce" employee-members in the exercise of their rights under § 7, 29 U.S.C. § 157, which include the right to engage in or refrain from concerted activities, but § 8(b)(1)(A) preserves to the union the

right "to prescribe its own rules with respect to the acquisition or retention of membership therein." However, the latter proviso does not permit a union to adopt rules which are not in furtherance of a legitimate union interest or which are counter to an overriding policy of the labor laws, *Scofield v. NLRB*, 394 U.S. 423, 429, 430, 89 S.Ct. 1154, 1157, 1158, 22 L.Ed.2d 385 (1969); *NLRB v. Industrial Union of Marine & Shipbuilding Workers of America*, 391 U.S. 418, 424, 88 S.Ct. 1717, 1721, 20 L.Ed.2d 706 (1968), such as fining a member for filing a charge with the Board, *NLRB v. Industrial Union of Marine & Shipbuilding Workers of America, supra,* 391 U.S. at 424, 88 S.Ct. at 1721, or for refusing to take part in conduct that violates the Act or the collective bargaining agreement, *Local 1104, Communications Workers of America v. NLRB*, 520 F.2d 411, 415 (2d Cir. 1975), *cert. denied*, 423 U.S. 1051, 96 S.Ct. 778, 46 L.Ed.2d 639 (1976); *NLRB v. Communications Workers Local 1170*, 474 F.2d 778, 782 (2d Cir. 1972); *Stationary Engineers, Local 39, International Union of Operating Engineers*, 240 N.L.R.B. 1122, 1123 (1979). The "policy of the Act is to insulate employees' jobs from their organizational rights," *Radio Officers' Union v. NLRB*, 347 U.S. 17, 40, 74 S.Ct. 323, 335, 98 L.Ed. 455 (1954).

■ In resolving the tension between a union's organizational rights and its members' exercise of rights guaranteed by § 7, the law allows a union to take disciplinary action against a member for refusing to engage in protected activity that will not jeopardize his job, see, e.g., *Scofield v. NLRB, supra* (adoption of piece work limits which would not entitle employer to discriminate against members obeying them), but does not allow it to do so because of a member's refusal to engage in conduct that is unlawful under the Act or that violates the collective bargaining agreement. *Local 1104, Communication Workers of America, supra; Stationary Engineers, Local 39, supra.* The issue before us here, however, is whether the Union may go further and punish a member for engaging in unprotected activity that violates neither the Act

nor the collective bargaining agreement, in this case refusing to perform mandatory overtime work, which would jeopardize a member's job by entitling the Employer to terminate his employment and refuse to reinstate him.

█ Putting aside the prohibition of a no-strike clause, not involved here, a union may properly adopt rules disciplining members who refuse to engage in a full economic strike in which they do no work for the employer. *NLRB v. Allis-Chalmers Manufacturing Co.*, 388 U.S. 175, 87 S.Ct. 2001, 18 L.Ed.2d 1123 (1967). Such strike activity is lawful and protected from being used as the grounds for punishment of striking employees by the employer, who must look elsewhere for substitutes and cannot deny the employees reinstatement upon termination of the strike, in absence of good cause. An employee who chooses to continue working but refuses to obey his employer's orders to perform activities forming a legitimate part of his work is not so protected. He is obligated to perform all of the work he was hired to do. To permit an employee in such a fashion unilaterally to dictate the terms and conditions of his employment could lead to chaos. An employer is entitled to receive from a person who opts for continued employment the full and undiluted performance of the duties for which he is hired and paid. The employee cannot have it both ways, i.e., continue to be employed but insist on working part-time as an economic weapon, any more than the employer would be permitted unilaterally to pay an employee less than the agreed upon wages for his services. See *Excavation-Construction, Inc. v. NLRB*, 660 F.2d 1015, 1020–22 (4th Cir. 1981); *Liberty Mutual Insurance Co. v. NLRB*, 592 F.2d 595, 604–06 (1st Cir. 1979); *Shelly & Anderson Furniture Manufacturing Co., Inc. v. NLRB*, 497 F.2d 1200, 1202–03 (9th Cir. 1974).[1] Applying this rule, courts have uniformly held that a concerted

refusal to perform overtime is an unprotected partial work stoppage. See, e.g., *Excavation-Construction, Inc. v. NLRB, supra*, 660 F.2d at 1020–22; *First National Bank of Omaha v. NLRB*, 413 F.2d 921, 925 (8th Cir. 1969); *C.G. Conn, Ltd. v. NLRB*, 108 F.2d 390, 397–98 (7th Cir. 1939).

█ A union rule requiring an employee to engage in such unprotected activity, even though adopted by a majority of the union's members, amounts to an unlawful restraint or coercion on its employee-members. It forces them, if they wish to continue working, to engage in unlawful activity and to risk being lawfully discharged by their employer or subjected to lawful imposition of disciplinary measures. An employee who engages in lawful strike activity retains his accrued rights, § 2(3) of the Act, 29 U.S.C. § 152(3), and is entitled to reinstatement upon conclusion of the strike unless the employer shows legitimate reasons to the contrary, *NLRB v. Fleetwood Trailer Co.*, 389 U.S. 375, 378, 88 S.Ct. 543, 545, 19 L.Ed.2d 614 (1967); *H. & F. Binch Co. Plant v. NLRB*, 456 F.2d 357, 364–65 (2d Cir. 1972); *The Laidlaw Corporation v. NLRB*, 414 F.2d 99, 105 (7th Cir. 1969), *cert. denied*, 397 U.S. 920, 90 S.Ct. 928, 25 L.Ed.2d 100 (1970). However, an employee discharged for misconduct in violation of the terms of his employment may be denied reinstatement, *Liberty Mutual Insurance Co. v. NLRB, supra*, 592 F.2d at 605–06; *NLRB v. John S. Swift Co.*, 277 F.2d 641, 646 (7th Cir. 1960). For these reasons, this type of economic coercion on the part of a union, forcing members to engage in unprotected activity, is impermissible since it jeopardizes the members' employment relationships, imperils their livelihood, and impairs our national labor policy. *Insurance Workers International Union*, 236 N.L.R.B. 440 (1978), see *Scofield v. NLRB, supra*, 394 U.S. at 428, 89 S.Ct. at 1157; *NLRB v. Boeing Co.*,

---

1. There is one exception to the rule:

    "The statutory protective shield extends to a *single* refusal to work overtime if it is a concerted activity directed at changing working conditions or employer policy." *NLRB v. Gulf-Wandes Corp.*, 595 F.2d 1074, 1078 (5th

Cir. 1979) (emphasis added); *see NLRB v. A. Lasaponara & Sons, Inc.*, 541 F.2d 992, 997–99 (2d Cir. 1976), *cert. denied*, 430 U.S. 914, 97 S.Ct. 1325, 51 L.Ed.2d 592 (1977). Since the Union's overtime ban was not a "one day" event, this exception does not apply.

412 U.S. 67, 73, 93 S.Ct. 1952, 1956, 36 L.Ed.2d 752 (1973). Nor may such a union role be saved on the ground that the employee who wishes to avoid unprotected activity may leave the union and escape the rule. A rule which is inconsistent with our national labor policy must give way.

None of the Supreme Court decisions relied on by the Union supports its contentions that it may fine or discipline a member for refusal to engage in unprotected activity. In *NLRB v. Insurance Agents' International Union*, 361 U.S. 477, 80 S.Ct. 419, 4 L.Ed.2d 454 (1960), the Court merely held that unprotected union activity used as a form of economic pressure (e.g., work stoppages, " 'slow-down,' 'sit-in,' and arguably unprotected disloyal tactics," for which "the employer could have discharged or taken other appropriate disciplinary action against the employees," *id.* at 493–94, 80 S.Ct. at 429–30) did not constitute a refusal to bargain in good faith in violation of § 8(b)(3) of the Act. The Court was not called upon to rule whether the union's disciplining of a member for not joining in such unprotected activity would violate § 8(b)(1)(A) of the Act, which is the issue here. In *Scofield, supra,* the piece-work ceiling could not have any adverse effect on the employment relationships of the employees with their employer, see 394 U.S. at 432–33, 89 S.Ct. at 1159; here the overtime ban would jeopardize their jobs. In *Lodge No. 76, International Association of Machinists v. Wisconsin Employment Relations Commission,* 427 U.S. 132, 96 S.Ct. 2548, 49 L.Ed.2d 396 (1976), the Court did not hold that the Act permits union disciplining of members for refusal to obey a union ban on overtime; it simply held that regulation of the use of an overtime ban as an economic weapon was activity preempted to the Board under the Act and free of regulation by the states. Indeed, the Court then took pains to point out that it was not ruling on the question of whether the overtime ban there was "protected" under § 7, but confirmed that the employer would in any event have countervailing economic weapons available, including "discharg[ing] or tak[ing] other appropriate disciplinary ac-

tion against the employees participating," *id.,* 427 U.S. at 152–53 & n.14, 96 S.Ct. at 2558–59 & n.14. In *NLRB v. Boeing Co., supra,* 412 U.S. 67, 93 S.Ct. 1952, 36 L.Ed.2d 752, the Court, in holding that the Board had no authority under the Act to rule on the reasonableness of union fines "not affecting the employer-employee relationship and not otherwise prohibited by the Act," *id.* at 73, 93 S.Ct. at 1956, reaffirmed the holding of *Scofield* that "the Board would have authority to pass on those rules affecting an individual's employment status but not on his union membership status," *id.* at 73–74, 93 S.Ct. at 1956.

◼ Applying the foregoing principles here, it is clear that, unless justified as a defense to unlawful activity on the Employer's part, the Union's overtime ban violated § 8(b)(1)(A) of the Act. In the present case overtime, being mandatory and lawfully required, was an integral part of the employees' assigned duties and could not lawfully be rejected by them. The Union's rule banning overtime therefore jeopardized their employment relationship, since it would entitle the Employer to terminate them without reinstatement or take other disciplinary action against them.

◼ The Union next contends that even if the ban would ordinarily be unlawful it was legally justified in this case as a response to general unfair labor practices allegedly committed by the Employer during the course of its collective bargaining with the Union. The Union relies on *Mastro Plastics Corp. v. NLRB,* 350 U.S. 270, 76 S.Ct. 349, 100 L.Ed. 309 (1956), which upheld employees' right to strike in response to their employer's unfair labor practice. The Board replies that *Mastro Plastics,* which involved "total" (and hence protected) strike activity on the part of employees, should not govern the present case, which grows out of unprotected "partial" strike activity not aimed at an employer's attempt to impose unlawful working conditions. We find it unnecessary to resolve this issue since the Board here made a finding, supported by substantial evidence, that the

overtime ban was not adopted in response to the Employer's alleged unfair labor practices but solely as an economic weapon to improve the Union's bargaining position in on-going negotiations.

The Union's August 28, 1978 notice announcing the overtime ban made no mention of any conduct on the Employer's part that might amount to an unfair labor practice. Nor was there any evidence of discussion at the Union meeting on that date of any such unfair labor practice on the part of the Employer. In requiring that the employees work their agreed-upon mandatory overtime, the Employer was not attempting thereby unilaterally to impose a change in terms of employment over the protest of the Union or its members. The evidence, on the contrary, indicated that the members approved the ban because of dissatisfaction with the Employer's failure to reach an agreement promptly with the Union rather than because the Employer was doing anything unlawful.[2] Moreover, the Union failed for almost two months after the August 28, 1978, meeting to file any unfair labor practices against the Employer, which supports the Board's inference that the August 28 ban represented a bargaining weapon. Otherwise the charges would have been filed immediately.

After the Board applied for enforcement of its order the Union filed with us in this proceeding a motion that the case be remanded to the Board for the taking of additional evidence which would allegedly support its defense that it promulgated the overtime ban in response to the Employer's alleged unfair labor practice. This relief, which the Board opposes, is sought on the ground that the ALJ, by erroneously precluding subjective evidence of the Union's

purpose and excluding certain minutes of Union meetings and Union-Employer bargaining sessions, prevented or dissuaded it from proving the Employer's unfair labor practices and that Union members were motivated thereby to adopt the ban.

At the hearing on the Board's charges the ALJ initially ruled that the Union's intent in adopting the ban and disciplining its members for violation thereof was irrelevant. However, after the Board's General Counsel made out a prima facie case through documentary proof of the Union's adoption and implementation of the ban, the ALJ permitted the Union to introduce through Ms. Goodall, its recording secretary, testimony and exhibits showing what occurred at the August 28th special meeting of the Union at which the ban was adopted. The ALJ, advised of the Union's defense, indicated that he was aware of the unfair labor practices against the Employer, which had been settled, that he did not want a collateral trial of those charges, that he would admit objective evidence of facts with respect to the Union's defense, and that he would exclude a witness' "opinion and conclusions." The ALJ, although admitting the foregoing testimony and minutes of the August 28th meeting, excluded other documents claimed by the Union to show unfair labor practices by the Employer, including minutes of bargaining sessions and communications by the Employer to employees regarding bargaining proposals and the status of negotiations.

After introducing Ms. Goodall's testimony the Union rested without making any offer of the proof (other than the rejected minutes) which it wished to introduce to show motivation or unfair labor practices. Nor did the Union, upon the General Counsel's

---

2. The Union points to the following answer of its recording secretary, Phyllis Goodall, given in the course of her testimony before the ALJ, as evidence that it acted in retaliation for unfair labor practices on the part of the Employer:

"Q Can you tell us, at that meeting, what was said by certain members when they spoke on it [the ban]? Either for or against, and if you can remember specific names of people who spoke? And if you can't, tell me you can't.

"A No, all I do remember is that they gave the same argument all the time in speaking about why we were working the company's overtime when they're, you know, were doing different things to the members. This was brought up continuously on the floor and at work."

However, this vague answer is hardly sufficient to call for rejection of the Board's findings made on the basis of other evidence.

appeal to the Board, file any cross-exceptions to the ALJ's rulings, seek to reopen the record, or even contend that it would have offered any additional evidence other than that rejected by the ALJ even though the General Counsel contested the ALJ's finding that the ban was adopted as a response to employer unfair labor practices.

On the record before it the Board, in reversing the ALJ's finding that the ban was a permissible response to unfair labor practices, stated that under that theory a union must prove that unfair labor practices occurred, and therefore the ALJ had erred in not permitting the Union to litigate the alleged unfair labor practices by the Employer. However, it found that proof of the Employer's unfair labor practices would not have made any difference because the Union's ban had not been adopted in response thereto but "solely as a bargaining tactic." 252 N.L.R.B. at 938. Following the Board's decision, the Union did not seek leave to present additional evidence on the issues of motivation or unfair labor practices. Nor did it at any point indicate dissatisfaction with the ALJ's evidentiary rulings and exclusion of the minutes and letters offered by the Union. Indeed, the first time the Union sought to reopen the record to take additional evidence was on this appeal.

Section 10(e) of the Act, 29 U.S.C. § 160(e), provides that no objection not urged before the Board shall be considered by the court except where the failure to urge it is excused because of extraordinary circumstances. It further provides that the Board's findings when supported by substantial evidence shall be conclusive and that the court may on motion reopen the record to take additional material evidence upon a showing that there were reasonable grounds for the failure to adduce the evidence in the hearing before the Board.[3] See *Detroit Edison Co. v. NLRB*, 440 U.S. 301, 311–12 & n.10, 99 S.Ct. 1123, 1129–30 & n.10, 59 L.Ed.2d 333 (1979); *NLRB v. Ochoa Fertilizer Corp.*, 368 U.S. 318, 82 S.Ct. 344, 7 L.Ed.2d 312 (1961); *NLRB v. Cheney California Lumber Co.*, 327 U.S. 385, 66 S.Ct. 553, 90 L.Ed. 739 (1946). The purpose of this provision is to insure against piecemeal appeals to the court by requiring the parties first to give the Board an opportunity to rule upon all material issues in a case. The Board has implemented this statutory policy by adopting regulations requiring the parties to raise by exceptions or cross-exceptions all issues they desire the Board to consider in reviewing an ALJ's decision. These regulations specifically provide that any exception "not specifically urged shall be deemed to have been waived," Board Rules and Regulations, Series 8, as amended, 29 C.F.R. § 102.46(b) and (h). In the present case the Union not only failed, upon being apprised of the ALJ's adverse rulings, to make a specific offer of proof (except as to the rejected minutes and letters), but failed to file any cross-exceptions with the Board after receiving the General Counsel's exceptions.

■ The Union argues that since it had prevailed before the ALJ it should be excused for not having filed timely cross-exceptions with the Board. This contention must be rejected, however, for the reason that the Union was put on notice of the possible importance of its evidence of motive and unfair labor practices by the General Counsel's exceptions taken to the ALJ's

---

**3.** Section 10(e) provides in pertinent part:

"No objection that has not been urged before the Board, its member, agent, or agency, shall be considered by the court, unless the failure or neglect to urge such objection shall be excused because of extraordinary circumstances. The findings of the Board with respect to questions of fact if supported by substantial evidence on the record considered as a whole shall be conclusive. If either party shall apply to the court for leave to adduce additional evidence and shall show to the satisfaction of the court that such additional evidence is material and that there were reasonable grounds for the failure to adduce such evidence in the hearing before the Board, its member, agent, or agency, the court may order such additional evidence to be taken before the Board, its member, agent, or agency, and to be made a part of the record."

holdings that were favorable to the Union. Moreover, the Union could still have raised the evidentiary issues after learning of the Board's adverse decision by moving for reconsideration, rehearing or reopening of the record as it was permitted to do under § 10(d) of the Act and regulations promulgated thereunder, 29 C.F.R. § 102.48(d).[4] Having failed to bring the evidentiary errors "to the Board's attention through a petition for rehearing, it cannot assert [them] here on appeal," *Glaziers' Local No. 558 v. NLRB*, 408 F.2d 197, 203 (D.C.Cir. 1969). "Simple fairness ... requires as a general rule that courts should not topple over administrative decisions unless the administrative body not only has erred but has erred against objection made at the time appropriate under its practice." *United States v. L.A. Tucker Truck Lines, Inc.*, 344 U.S. 33, 37, 73 S.Ct. 67, 69, 97 L.Ed. 54 (1952).

Nor are we persuaded by the Union's argument that a motion before the Board for reconsideration or introduction of additional evidence would have been futile because most such motions are usually denied by the Board. It would be surprising to find that motions for reconsideration or reopening were not usually denied since in most cases the proferred evidence is not newly discovered but is immaterial or cumulative evidence that would not change the Board's decision. We cannot, however, accept the Union's contention that if it had, upon a motion to the Board based on specific evidence showing that the result would

be changed, the Board would have denied the motion. To accept this contention would be to assume that the Board's procedures for reconsideration are meaningless. This we cannot do. Here the Union at no time offered specific evidence on the issues of motivation other than the minutes and letters excluded by the ALJ. Our review of these documents merely reveals that the parties were locked in hard bargaining and that the ban, rather than constituting a reaction to unfair labor practices on the Employer's part, was adopted by the Union as an affirmative bargaining weapon. Lastly, to remand this case, which is now more than 3½ years old, to the Board for further proceedings would only promote interminable delay without appreciable likelihood of any change in the result. There comes a time when further litigation of a case must stop and it has been reached here.

Accordingly the petition for enforcement of the Board's order is granted and the motion to remand the proceedings is denied.

---

4. Section 10(d) provides:
  "(d) Until the record in a case shall have been filed in a court, as hereinafter provided, the Board may at any time upon reasonable notice and in such manner as it shall deem proper, modify or set aside, in whole or in part, any finding or order made or issued by it."
 29 C.F.R. § 102.48(d)(1) provides:
  "(d)(1) A party to a proceeding before the Board may, because of extraordinary circumstances, move for reconsideration, rehearing, or reopening of the record after the Board decision or order. A motion for reconsideration shall state with particularity the material error claimed and with respect to any finding of material fact shall specify the page of the record relied on. A motion for rehearing shall specify the error alleged to require a hearing de novo and the prejudice to the movant alleged to result from such error. A motion to reopen the record shall state briefly the additional evidence sought to be adduced, why it was not presented previously, and that, if adduced and credited, it would require a different result. Only newly discovered evidence, evidence which has become available only since the close of the hearing, or evidence which the Board believes should have been taken at the hearing will be taken at any further hearing."