NEW ENGLAND HEALTH CARE EM-
PLOYEES UNION, District 1199,
SEIU, AFL–CIO, Petitioner,

v.

NATIONAL LABOR RELATIONS
BOARD, Respondent,

Church Homes, Inc., d/b/a Avery
Heights, Intervenor.

Docket No. 05–0181–AG.

United States Court of Appeals,
Second Circuit.

Argued: Dec. 21, 2005.

Decided: April 19, 2006.

John M. Creane, Law Firm of John M. Creane, Milford, CT, for Petitioner.

Aileen A. Armstrong, Deputy Associate General Counsel (Robert J. Englehart, Supervisory Attorney, Steven B. Goldstein, Attorney, Arthur F. Rosenfeld, Acting General Counsel, John E. Higgins, Jr., Deputy General Counsel, Margery E. Lieber, Acting Associate General Counsel, on the brief), National Labor Relations Board, Washington, DC, for Respondent.

Michael C. Harrington, Murtha Cullina LLP, Hartford, CT, for Intervenor.

Before: JACOBS, LEVAL, STRAUB, Circuit Judges.

JACOBS, Circuit Judge.

The New England Health Care Employees Union ("Union") petitions for review of so much of the decision of the National Labor Relations Board ("Board") as dismissed the complaint alleging that Church Homes, Inc., d/b/a Avery Heights ("Avery"), violated §§ 8(a)(1) and (3) of the National Labor Relations Act ("Act"), 29 U.S.C. §§ 158(a)(1) and (3), when it failed to reinstate all strikers upon their unconditional offer to return to work. Avery refused to reinstate the strikers on the

ground that it had hired permanent replacements—a measure that an employer is free to take in order to withstand or end a strike. The Administrative Law Judge ("ALJ") found, however, that Avery had an independent unlawful motive for hiring permanent replacements for the striking workers—to break the Union—and that its refusal to reinstate therefore violated the Act. The Board reversed on the ground that the Board General Counsel ("General Counsel"), who represented the Union (the Charging Party) before the ALJ, *see* 29 U.S.C. § 153(d), had failed to demonstrate that Avery had an independent unlawful motive for hiring the permanent replacements. We conclude that the Board's determination was based on arbitrary and capricious reasoning, and therefore grant the Union's petition.

## Background

Avery is a combined nursing home/assisted living facility for approximately 500 adults. The Union has been the certified bargaining representative for all service and maintenance employees at Avery since the early 1970s. Approximately 180 to 185 of the Union's members began an economic strike on November 17, 1999, after Avery and the Union were unable to agree on a new contract. Initially, Avery carried on operations by relying on nonstriking employees, managers, temporary employees, and volunteers. The evidence shows that Avery officials were satisfied at first with the continuity and quality of patient care and with worker morale, but became concerned about their ability to sustain patient care as long hours and stressful conditions continued. On December 2, the Union President warned Avery's chief negotiator that, unless compromises were made, the strike was going to be a long one.

On or about December 15, 1999, Avery began hiring permanent replacements, both directly and through outside agencies charging substantial fees. Avery paid the permanent replacements an hourly wage that was higher than it was offering the strikers, but less than it was paying its temporary workers and less than what the Union was demanding at the bargaining table.

Avery made a conscious decision to tell the Union nothing about the hiring of permanent replacements, and took active measures to keep the replacement campaign a secret while hiring as many permanent workers as it could before the Union caught on. By the end of December, however, the Union received reports from workers and discovered other clues, and arranged for a meeting with Avery and a federal mediator on January 3, 2000; at that meeting, Avery disclosed that "over 100" permanent replacements had been hired.

On January 5, 2000, the Union offered on behalf of the strikers to return to work immediately. Avery noted that the offer was not unconditional. On January 20, 2000, the Union renewed the offer to return, this time unconditionally. Avery began recalling strikers to positions that had not been occupied by permanent replacements, ultimately reinstating 78 or 79.

## The Board Decision

The Board ruled that Avery "properly exercised its right to hire permanent replacements for its striking employees and that it did not violate Section 8(a)(3) [of the Act] when it refused to reinstate the strikers upon their January 20, 2000 unconditional offer to return to work." Bd. Decision at 8. The Board cited the rule that an employer has a right to hire permanent replacement workers—a valuable tool for "fight[ing] back" in an economic battle—

absent a showing that the employer had an independent unlawful motive for the hiring, *id.* at 6, and found that no such unlawful motive was shown here. Effectively, the Board ruled that no inference of unlawful motive could be drawn from Avery's secrecy because an employer is not "under a duty to disclose to a union its intention to hire permanent replacements." *Id.* at 6.

The Board reasoned that an employer has no duty to notify a union that replacement workers are being hired, and may legitimately hire in secret, because at least one valid objective of such hiring—an enhanced ability to withstand the strike—does not depend on making the striking workers aware that they are being replaced. Even assuming that Avery was required to inform the Union, the Board concluded that Avery complied with that requirement at the January 3 meeting. *See id.* at 6. The Board emphasized the "sharp distinction between seeking to prevail over the Union," which is a lawful goal, "and seeking to oust the Union as a bargaining representative," which is not. *Id.* at 7. According to the Board, there was no evidence that Avery was seeking to oust the Union and ample evidence that Avery's goal was to exert economic pressure on the Union to induce it to reach an agreement on terms favorable to Avery. *Id.* We refer to the goal of exerting economic pressure on the Union as the "bargaining leverage rationale" for Avery's conduct.

The dissenting board member concluded that the General Counsel had discharged his burden of showing that Avery had an independent unlawful motive—"to undermine the Union by engendering striker dissatisfaction with the Union"—for the decision to hire permanent replacements, Bd. Decision at 13, 15 (Walsh, *M.*, dissenting in part), that the burden therefore shifted to Avery to demonstrate that it would have hired the permanent replace-

ments even in the absence of that unlawful motive, *id.* at 14, and that the rationales proffered by Avery had been "exposed as shams," *id.* at 15.

For several reasons, the dissenter rejected the majority's rationale that the hiring of replacements was motivated by Avery's desire for bargaining leverage: (i) Avery's principals explicitly disavowed that rationale; (ii) the Board never explained "how [Avery's] secrecy [was] consistent with a motive to gain economic leverage," when in fact "such leverage could only have been exerted through disclosure," *id.* at 15; and (iii) "*undisclosed, the hiring of replacements exerted no economic leverage,*" *id.* at 15–16 (emphasis in original).

## Discussion

### A. Applicable Law

Section 7 of the Act, 29 U.S.C. § 157, grants employees the "right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection." *See also* 29 U.S.C. § 163 ("Nothing in this Act ... shall be construed so as either to interfere with or impede or diminish in any way the right to strike ...."). To implement this right, § 8(a)(1) of the Act, 29 U.S.C. § 158(a)(1), makes it an unfair labor practice for an employer "to interfere with, restrain, or coerce employees in the exercise" of their § 7 rights. And § 8(a)(3) of the Act, 29 U.S.C. § 158(a)(3), makes it an unfair labor practice for an employer to "discourage membership in any labor organization."

Under Supreme Court precedent, an employer that refuses to reinstate economic strikers violates § 8(a)(3) unless it can demonstrate that it acted to advance a "legitimate and substantial business justi-

fication[ ].'" *See NLRB v. Fleetwood Trailer Co.,* 389 U.S. 375, 378, 88 S.Ct. 543, 19 L.Ed.2d 614 (1967) (quoting *NLRB v. Great Dane Trailers,* 388 U.S. 26, 34, 87 S.Ct. 1792, 18 L.Ed.2d 1027 (1967)). The hiring of permanent replacement workers amounts to one such legitimate and substantial business justification. *See NLRB v. Int'l Van Lines,* 409 U.S. 48, 50, 93 S.Ct. 74, 34 L.Ed.2d 201 (1972) ("[A]n employer may refuse to reinstate economic strikers if in the interim he has taken on permanent replacements."); *Belknap, Inc. v. Hale,* 463 U.S. 491, 504 n. 8, 103 S.Ct. 3172, 77 L.Ed.2d 798 (1983) ("The refusal to fire permanent replacements because of commitments made to them in the course of an economic strike satisfies the requirement of [*Fleetwood Trailer*] that the employer have a legitimate and substantial justification for its refusal to reinstate strikers.") (internal quotation marks omitted). Consequently, "[w]here employees have engaged in an economic strike, the employer may hire permanent replacements whom it need not discharge even if the strikers offer to return to work unconditionally." *Belknap,* 463 U.S. at 493, 103 S.Ct. 3172.

At the same time (as the Board recognized), the Act is violated if "an independent unlawful purpose" motivated the hiring of permanent replacements.[1] Bd. Decision at 5; *see also Hot Shoppes Inc.,* 146 NLRB 802, 805 (1964). As with other elements of an unfair labor practice, the General Counsel cannot prevail without a finding that the employer had an independent unlawful purpose. *See NLRB v. Transp. Mgmt. Corp.,* 462 U.S.

393, 401, 103 S.Ct. 2469, 76 L.Ed.2d 667 (1983).

## B.  Business Necessity

On appeal, the Union argues that an employer that permanently replaces striking workers bears the burden of establishing that the hiring of replacements was itself motivated by a legitimate and substantial business necessity.[2] We decline to consider this argument.

In the absence of "extraordinary circumstances," we may consider only objections argued before the Board. 29 U.S.C. § 160(e); *see also NLRB v. GAIU Local 13–B,* 682 F.2d 304, 311 (2d Cir.1982). "The Board has implemented this statutory policy by adopting regulations requiring the parties to raise by exceptions or cross-exceptions all issues they desire the Board to consider in reviewing an ALJ's decision." *GAIU,* 682 F.2d at 311; *see also* Bd. Rules and Regulations, Series 8, as amended, 29 C.F.R. § 102.46(b) and (h) (stating that any exception "not specifically urged shall be deemed to have been waived"). The purpose of the statutory requirement and implementing regulations is to ensure that the Board has "an opportunity to rule upon all material issues in a case." *GAIU,* 682 F.2d at 311; *see also United States v. L.A. Tucker Truck Lines, Inc.,* 344 U.S. 33, 37, 73 S.Ct. 67, 97 L.Ed. 54 (1952) ("Simple fairness . . . requires as a general rule that courts should not topple over administrative decisions unless the administrative body not only has erred but has erred against objection made at the time appropriate under its practice."). Absent an objection or an "extraordinary circumstance[ ]," we are bound by Board

---

1.  Following the Board, we use the terms "purpose" and "motive" interchangeably.

2.  The Union does not contest the Board's finding that Avery hired over 100 permanent replacements prior to the Union's uncondi-

tional offer to return to work, and concedes that Avery reinstated strikers who had not been permanently replaced at the time of that offer.

determinations, even erroneous ones, that are not "patently in excess of [the Board's] authority." *Detroit Edison Co. v. NLRB*, 440 U.S. 301, 311, 99 S.Ct. 1123, 59 L.Ed.2d 333 (1979).

The General Counsel declined to assert the business necessity argument. The General Counsel has complete "discretion to decide whether or not to issue a complaint, and to determine which issues to include in that complaint," *Williams v. NLRB*, 105 F.3d 787, 791 n. 3 (2d Cir.1996) (internal citations omitted); *see* 29 U.S.C. § 153(d) ("[The General Counsel] shall have final authority, on behalf of the Board, in respect of the investigation of charges and issuance of complaints under section 10 [of the Act], and in respect of the prosecution of such complaints before the Board ...."), and his "refusal to include an issue in the complaint is final and unreviewable." *Williams*, 105 F.3d at 791 n. 3.

When the Union itself tried to make the business necessity argument, the ALJ refused to hear it on the ground that the argument "enlarged upon or change[d]" the allegations of the complaint.[3] Bd. Decision at 26 (citing *Kimtruss Corp.*, 305 NLRB 710, 711 (1991) ("It is settled that a charging party cannot enlarge upon or change the General Counsel's theory.")); *see also IBEW, Local No. 903*, 230 NLRB 1017, 1019–20 (1977) ("[T]o permit the Charging Party to introduce ... evidence to support theories of violations [other] than the theory relied upon by the General Counsel, is tantamount to granting to the Charging Party authority to amend the complaint in derogation of the authority of the General Counsel who has exclusive authority as to the issuance and conduct of the complaint."). On appeal to the Board, the Union initially filed—but then withdrew—an exception to the ALJ's refusal to consider the business necessity argument. It thus transpired that the parties (i.e., the General Counsel and the Union) never actually presented the business necessity argument to the Board. Since we are bound by a Board determination absent "extraordinary circumstances" or Board action "patently in excess" of its authority, and since the Union has brought to our attention evidence of neither condition,[4] we decline to consider the business necessity argument.

### C. The Board's Findings

The Union challenges the Board's finding that Avery was not motivated by "an independent unlawful purpose" in hiring permanent replacements, and argues that this finding is unsupported by substantial evidence. We do not reach that question because we conclude that the Board made a central and unwarranted inference that renders its conclusion arbitrary and capricious.

Because Congress has delegated administration of the Act to the Board—

---

3. The ALJ referred to the Union's argument as the "'inherently destructive' theory" because the Union had argued that the hiring of permanent replacements constituted a form of "inherently destructive" conduct, which under Supreme Court precedent places on the employer (at least) a burden of demonstrating that the conduct was motivated by "legitimate and substantial business justifications." *See* Bd. Decision at 25–26; *see also Great Dane*, 388 U.S. at 34, 87 S.Ct. 1792.

4. Whatever would necessitate a finding that Board action was "patently in excess" of its authority, the Board's rejection of the business necessity argument certainly does not constitute such excess given that no Supreme Court precedent compels adoption of the argument. *See Belknap*, 463 U.S. at 504 n. 8, 103 S.Ct. 3172 (observing that no Supreme Court precedent compels conclusion that employer's motive for hiring permanent replacements is relevant).

whose members we presume to have "broad experience and expertise in labor-management relations"—we accord great deference to the Board's findings of fact, *Penasquitos Village, Inc. v. NLRB,* 565 F.2d 1074, 1079 (9th Cir.1977); we are particularly deferential when the Board draws inferences based on its expertise, *see Radio Officers' Union v. NLRB,* 347 U.S. 17, 48–49, 74 S.Ct. 323, 98 L.Ed. 455 (1954); *see also NLRB v. Iron Workers,* 434 U.S. 335, 341, 98 S.Ct. 651, 54 L.Ed.2d 586 (1978) ("[The Board's] resolution of ... mixed factual and legal questions normally survives judicial review.").

Deference has its limits: we are not bound to abide by the Board's derivative inferences to the extent that they are "irrational," "tenuous," or "unwarranted." *Penasquitos Village,* 565 F.2d at 1079 (internal quotation marks omitted); *see also Universal Camera,* 190 F.2d at 432 ("[W]e must abide by [the Board's derivative inferences] unless they are irrational.") (Frank, *J.,* concurring). If such an irrational derivative inference is sufficiently central to the Board's conclusion, the drawing of the inference may be arbitrary and capricious pursuant to 5 U.S.C. § 706(2)(A). *See Bowman Transp., Inc. v. Arkansas–Best Freight Sys., Inc.,* 419 U.S. 281, 284, 95 S.Ct. 438, 42 L.Ed.2d 447 (1974) ("[T]hough an agency's finding may be supported by substantial evidence ... it may nonetheless reflect arbitrary and capricious action."). In *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,* the Supreme Court delineated the proper scope of judicial review:

> The scope of review under the arbitrary and capricious standard is narrow and a court is not to substitute its judgment for that of the agency. Nevertheless, the agency must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made. In reviewing that explanation, we must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment.

463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983) (internal quotation marks and citations omitted); *see also Allentown Mack Sales and Serv., Inc. v. NLRB,* 522 U.S. 359, 374, 118 S.Ct. 818, 139 L.Ed.2d 797 (1998) ("[A]djudication is subject to the [*State Farm* ] requirement of reasoned decisionmaking ...."). However, "[w]hile we may not supply a reasoned basis for the agency's action that the agency itself has not given, *SEC v. Chenery Corp.,* 332 U.S. 194, 196, 67 S.Ct. 1575, 91 L.Ed. 1995 (1947), we will uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *Bowman,* 419 U.S. at 285–86, 95 S.Ct. 438.

The ALJ chiefly relied on three pieces of evidence in concluding that Avery acted with the independent and unlawful purpose of punishing the strikers and breaking the Union's solidarity:

- Avery's principals conceded that "a decision was made not to inform the Union of [Avery's] plans to permanently replace the striking employees," from which the ALJ concluded that Avery "consciously concealed" what it was doing. Bd. Decision at 28, 33.

- On December 31, 1999, Avery CEO Harper sent a memo ("Harper's memo") to Avery's Board of Directors, stating that

  > [a]s a well-executed surprise event the day before Christmas, we began to permanently replace striking workers at Avery. These new employees have some distinct advantages: they are very pleased to have the job for the money we currently pay; they have fine work ethics; they want to learn;

they are less expensive than temporary workers; and they bring predictable stability for the future, when the strike is over, because they say they want to work here for a long time .... If [the Union] refuses to seriously negotiate in good faith, we plan to add one or more permanent replacements each day. We have [the Union] in a real bind at Avery.

*Id.* at 30.

• Scott Cohen, the owner of a temp agency used by Avery, testified that Avery's director of operations told him that its plans regarding permanent replacements were to be kept "hush-hush" and that it needed to get as many bodies hired as it could before the Union found out. *Id.* at 5.

The Board disagreed with the ALJ, finding that the General Counsel had in fact failed to demonstrate "an unlawful motive in hiring permanent replacements." *Id.* at 6.

We accept the Board's premise that an employer has no legal obligation to inform striking workers before hiring permanent replacements. *See Armored Transfer Serv., Inc.*, 287 NLRB 1244, 1251 n. 21 (1988). But it was "unwarranted," *see Penasquitos Village*, 565 F.2d at 1079 (internal quotation marks omitted), for the Board to conclude—based on that observation alone—that an employer's decision to keep the hiring of permanent replacements secret is not probative of whether the employer had an independent unlawful purpose for the hiring.

As the Board saw it, Avery's conduct enhanced its bargaining advantage in the "economic battle" by: (i) prolonging its capacity to withstand the strike and (ii) pressuring the strikers to return once they realized that they were being replaced. Bd. Decision at 6. That is sound as far as it goes; but it does not account for the secrecy. Why would an employer lawfully seeking to enhance its bargaining leverage keep secret the hiring of permanent replacements? There may be many legitimate explanations for secrecy—e.g., a fear of picket-line violence—but the Board made recourse to none.[5] Absent such countervailing considerations, and even if one adopts the Board's own analytic framework, logic suggests that an employer seeking to enhance its bargaining leverage by hiring permanent replacements would have every incentive to publicize the effort, and that an employer seeking only to prolong its ability to withstand the strike would be indifferent to whether the strikers and the union knew what it was doing.

Conversely, it would appear that employers with an illicit motive to break a union have a strong incentive to keep the ongoing hiring of permanent replacements secret. The replacement of over half of a unionized workforce with nonunion workers would devastate the union's power and credibility. An employer seeking to land such a blow cannot simply announce the hiring of large numbers of replacements, because in order to justify a refusal to allow striking workers to return to work under the "permanent replacement" safe harbor, the employer must have achieved

---

5. At the hearing before the ALJ, the Avery Administrator testified that she kept the hiring quiet to avoid picket line violence and striker interference with the hiring of replacements. Specifically, the Administrator testified that she had heard of a number of such violent incidents. (Although the Union points out that there was only one arrest for strike-related misconduct during the duration of the labor dispute). The ALJ found Avery's "fear of violence" rationale not credible because it was based entirely on hearsay evidence, and the Board did not discuss it. Bd. Decision at 33, 34.

an employment relationship with the permanent replacements somewhere between "a mere offer, unaccepted when the striker seeks reinstatement" and "actual arrival on the job." *See H & F Binch Co. v. NLRB*, 456 F.2d 357, 362 (2d Cir.1972). So an employer seeking to punish strikers and break a union therefore needs enough time to establish an employment relationship with a large number of permanent replacements *before* the union can react by offering to return to work, and will therefore have a strong incentive to keep the replacement program secret for as long as possible.

The Board acknowledged that it was "finding only that a purpose of the hiring of replacements was to gain economic leverage. We are *not* saying that the failure to disclose had that purpose." Bd. Decision at 7 n. 19. But the Board does not consider what the purpose of secrecy could have been.[6] There was therefore no apparent basis for the Board's conclusion that "the non-disclosure did not have an illicit motive." *Id.* at 7. While we bow to the Board's expertise, *see Radio Officers' Union*, 347 U.S. at 48–49, 74 S.Ct. 323, the Board offered no expertise-based analysis of the failure to disclose.

In sum, the Board erred because it failed to acknowledge the natural and logical implications of the facts it credited and the analytic framework it adopted.

At the same time, this opinion is narrow: Since we do not decide whether substantial evidence supported the Board's conclusion that the Union failed to carry its burden of demonstrating an independent unlawful purpose, this opinion does not preclude the Board on remand from reaching that same conclusion through adequate reasoning.[7]

\*      \*      \*      \*      \*      \*

The petition is granted, the decision of the Board vacated, and the case is remanded to the Board for further proceedings consistent with this opinion.

6. The Board does state that the characterization of the hiring of permanent replacements in Harper's memo as "a well-executed surprise event .... restates [Avery's] desire to surprise the Union and thereby obtain an economic advantage in the ongoing contract negotiations." Bd. Decision at 7. To the extent that this statement suggests a rationale for the secrecy (as opposed to the hiring), it is too cryptic for us to discern the Board's reasoning.

7. Avery urges us to consider additional evidence on the record that might suggest that it did not possess an independent unlawful motive, in particular that Avery: i) demonstrated an ongoing willingness to negotiate a contract with the Union, ii) agreed to a request by the Mayor of Hartford that Avery stop hiring additional permanent replacements while his mediation efforts were ongoing (despite having unprocessed job applications), and 3) solicited the Union's input on how best to recall strikers to available position, and then followed the Union's suggestions. The Board may also decline to accept the ALJ's negative credibility finding with respect to the evidence that Avery submitted suggesting that fear of picket line violence motivated its decision to keep secret the hiring of permanent replacements (provided the record supports such a reversal). If the NLRB concludes that Avery has refuted the logical implication that its secrecy was illicitly motivated, the NLRB should set forth the analysis supporting this conclusion.